972 A.2d 882

**STATE SECURITY CHECK CASHING, INC.**

v.

**AMERICAN GENERAL FINANCIAL SERVICES (DE)**
**a/k/a American General Financial Services, Inc.**

**No. 105 Sept.Term, 2008.**

Court of Appeals of Maryland.

June 9, 2009.

Bruce E. Kauffman (Jeffrey L. Foreman of Kauffman & Forman, P.A., Towson), on brief, for petitioner.

Petition and Brief Amicus Curiae of the Maryland Ass'n of Financial Service Centers in support of plaintiff-appellant: Scott K. McClain, Esq., Winne, Banta, Hetherington, Basralian & Kahn, P.C., Hackensack, NJ.

Sidney G. Leech (Derek M. Stikeleather of Goodell, DeVries, Leech & Dann, L.L.P., Baltimore), on brief, for respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, Judge.

In this case we are asked to determine which party, as between the issuer of a check and the check cashing business that cashed it, is liable under Md.Code, Commercial Law Art. § 3–404 (2002 Repl. Vol. & Supp. 2008) for the face amount of the check, when an imposter, posing successfully as another individual in securing a loan (the proceeds of which were represented by the check) from the issuer, subsequently negotiated the check at the check cashing business. We shall hold that, under the circumstances presented in this case, the issuer of the check is liable for the amount of the check.

## I.

## Factual and Procedural Background

On 20 June 2007, American General Financial Services, Inc., ("American General") was contacted by telephone by a man, later revealed to be an imposter posing as Ronald E. Wilder (we shall refer to this person as the "imposter", though he was not known to be so at most relevant times in this case). The imposter sought a $20,000.00 loan. Based on the information supplied by him over the telephone, American General ran a credit check on Ronald E. Wilder, finding his credit to be excellent. American General informed the imposter that it would need personal tax returns for the prior two years, and asked him what he intended to do with the proceeds of the desired loan.[1] The imposter sent by electronic facsimile to American General the requested tax returns of Mr. Wilder and explained that he wanted the loan to renovate a property he owned. On Friday, 22 June 2007, American General's District Manager received the completed loan application and tax returns, performed a cash flow analysis, and obtained approval from senior management for an $18,000.00 loan.

---

1. The testimony of Thurman Toland, the Branch Manager of American General's Security Boulevard branch in Baltimore County, revealed that the imposter claimed to be self-employed and sought an unsecured, personal loan.

On that same morning, American General informed the imposter that the loan was approved. The imposter appeared at noon at American General's Security Boulevard office in Baltimore County. He proffered an apparent Maryland driver's license bearing Mr. Wilder's personal information and the imposter's photograph. He remained in the loan office for approximately thirty minutes, meeting with the branch manager and a customer account specialist during the loan closing. After all the loan documents were signed, American General issued to the imposter a loan check for $18,000.00, drawn on Wachovia Bank, N.A., and payable to Ronald E. Wilder.

Later that afternoon, the imposter presented the check to State Security Check Cashing, Inc. ("State Security"), a check cashing business. At the time the imposter appeared in State Security's office, also on Security Boulevard in Baltimore County, only one employee was on duty, Wanda Decker. Decker considered the same driver's license that the imposter presented to American General, and reviewed the American General loan documents related to the check. She also compared the check to other checks issued by American General which had been cashed previously by State Security. Deeming the amount of the check relatively "large," Decker called Joel Deutsch, State Security's compliance officer, to confirm that she had taken the proper steps in verifying the check. Deutsch directed Decker to verify the date of the check, the name of the payee on the check, the address of the licensee, the supporting loan paperwork, and whether the check matched other checks in State Security's system from the issuer. Decker confirmed the results of all of these steps, and, upon Deutsch's approval, cashed the check, on behalf of State Security, for the imposter for a fee of 3–5%[2] of the face value of the check.

On Monday, 25 June, the next business day after the imposter negotiated the check at State Security, the real

---

**2.** At trial, Decker testified that it was State Security's practice to write the amount of cash given to the customer on the check cashed, and

Ronald E. Wilder appeared at the offices of American General indicating that he had been notified by the U.S. Secret Service that a person applied for a loan in his name. At that time, the true Ronald E. Wilder completed an Affidavit of Forgery. As a result of the Affidavit, Thurman Toland, the Branch Manager of American General's Security Boulevard branch, called Wachovia Bank to determine whether the $18,000.00 check had been presented for payment. Learning that the check had not been presented yet, Toland placed a "stop payment" on the check.

State Security filed a civil claim in the District Court of Maryland, sitting in Baltimore County, against American General for the face value of the check, plus interest, asserting that it was a holder in due course of American General's check, that it received the check in good faith, without knowledge of fraud, and that it gave value for the check. On 3 December 2007, the District Court conducted a bench trial. During the trial, the testimonies of Deutsch and Toland revealed three additional, potentially important points: (a) had State Security personnel called American General on 22 June 2007 to verify that American General issued a check to Ronald E. Wilder for $18,000.00, Toland would have confirmed that to be the case; (b) State Security employed a thumb print identification system for its check-cashing business, but, at the time the imposter cashed the check, it was unclear whether it was functional;[3] and (c) although, as part of the loan application process, American General obtained names and telephone numbers of personal references from the imposter, it did not call any of the references before delivering the check.

---

then to copy the check into the company's computer system. Decker testified that she completed both of these tasks with the check presented by the imposter. Deutsch testified that State Security would charge between 3–5% for cashing an $18,000 check. Neither State Security employee, however, brought the check, or the copy of the check, to trial. Thus, the exact fee State Security charged the imposter for cashing the check is not revealed on the record.

**3.** Deutsch testified that the system was in place on 22 June 2007, but he could not recall whether it was functioning properly.

On 19 December 2007, the District Court held in favor of American General, explaining:

> What was the one action that either party could have taken "to prevent the loss"? In the Court's view Security could have withheld payment, to the imposter, until the check cleared on the Defendant's "out of town" bank. But Security is in the business of cashing checks and charges a fee of between 3% and 5% for the check cashing service; and with a check of this amount, it probably earned a fee of approximately nine hundred ($900.00) dollars. If one is charging that type of a fee, a customer cashing a check on Friday is not going to wait until the following Monday to receive the proceeds. That is a risk of doing the type of business[ ] the Plaintiff chooses to do.

The District Court concluded that, under Md.Code, Commercial Law Art. § 3–404(d),[4] State Security had not exercised ordinary care in paying the imposter's check, and that its failure to exercise ordinary care contributed substantially to the loss.

---

4. Section 3–404 of the Commercial Law Article provides:

 (a) If an impostor, by use of the mails or otherwise, induces the issuer of an instrument to issue the instrument to the impostor, or to a person acting in concert with the impostor, by impersonating the payee of the instrument or a person authorized to act for the payee, an indorsement of the instrument by any person in the name of the payee is effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.

 (b) If (i) a person whose intent determines to whom an instrument is payable (§ 3-110(a) or (b)) does not intend the person identified as payee to have any interest in the instrument, or (ii) the person identified as payee of an instrument is a fictitious person, the following rules apply until the instrument is negotiated by a special indorsement:

 (1) Any person in possession of the instrument is its holder.

 (2) An indorsement by any person in the name of the payee stated in the instrument is effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.

 (c) Under subsection (a) or (b), an indorsement is made in the name of a payee if (i) it is made in a name substantially similar to that of the payee or (ii) the instrument, whether or not indorsed, is

State Security appealed to the Circuit Court for Baltimore County. A hearing was held on 24 July 2008, based on the record made in the District Court. On 8 August 2008, the Circuit Court issued its Memorandum Opinion and Order affirming the judgment of the District Court, reasoning:

[The District Court judge] applied the § 3–404(d) analysis to [State Security] as the "party who paid the instrument," and determined that [State Security] failed to exercise ordinary care in paying the $18,000.00 check and that the failure to do so substantially contributed to the loss resulting from payment of the instrument. The decision of the District Court turned on the question of "what was the one action that either party could have taken to 'prevent the loss?'" [The District Court judge] determined that [State Security] was the only party who could have prevented the loss by withholding payment to the "imposter" until the check cleared on [American General's] out-of-town bank and that [State Security's] failure to do so substantially contributed to the loss resulting from the payment of the $18,000.00 check.

The uncontroverted evidence at trial in the District Court shows that [State Security] immediately paid the $18,000.00 instrument to the imposter without utilizing its thumbprint identification system or waiting until the check cleared on [American General's] bank. Therefore, there is substantial evidence to support [the District Court judge's] determination that [State Security] failed to exercise ordinary care in paying the instrument as required by § 3–404(d), and that failure substantially contributed to the loss. Thus, the decision of the District Court is not clearly erroneous.

deposited in a depositary bank to an account in a name substantially similar to that of the payee.

(d) With respect to an instrument to which subsection (a) or (b) applies, if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

State Security pressed on. It filed a petition for writ of certiorari with this Court, pursuant to Md.Code, Courts and Judicial Proceedings Art. §§ 12–305 and 12–307 (2006 Repl. Vol. & Supp. 2008),[5] seeking review of the Circuit Court's judgment. We issued the writ. *State Sec. v. Am. Gen.*, 406 Md. 443, 959 A.2d 793 (2008).[6]

## II.

### Discussion

In the District Court and the Circuit Court, State Security argued that, under Md.Code, Commercial Law Art. § 3–302, it

---

**5.** Md.Code, Courts and Judicial Proceedings Art. § 12–305 provides:

The Court of Appeals shall require by writ of certiorari that a decision be certified to it for review and determination in any case in which a circuit court has rendered a final judgment on appeal from the District Court or has rendered a final judgment on appeal from an administrative decision under Title 16 of the Transportation Article if it appears to the Court of Appeals, upon petition of a party that

(1) Review is necessary to secure uniformity of decision, as where the same statute has been construed differently by two or more judges; or

(2) There are other special circumstances rendering it desirable and in the public interest that the decision be reviewed.

Md.Code, Courts and Judicial Proceedings Art. § 12–307 provides:

The Court of Appeals has:

(1) Jurisdiction to review a case or proceeding pending in or decided by the Court of Special Appeals in accordance with Subtitle 2 of this title;

(2) Jurisdiction to review a case or proceeding decided by a circuit court, in accordance with § 12 305 of this subtitle;

(3) Exclusive appellate jurisdiction with respect to a question of law certified to it under the Uniform Certification of Questions of Law Act; and

(4) Exclusive appellate jurisdiction over a criminal case in which the death penalty is imposed and any appellate proceeding under § 3–904 of the Correctional Services Article.

**6.** The successful petition posed the following questions for review:

I. What is the standard of care required by Commercial Law Article, § 3–404(d), of a person who, in good faith[,] takes and cashes a check issued to an imposter?[ ]

II. Did the lower courts err in holding that State Security Check Cashing, Inc. was required to wait until a check issued to and negotiated by an imposter had cleared before giving the imposter the proceeds of the check?

was a holder in due course of the check issued by American General. Neither the District Court nor the Circuit Court, however, resolved that claim in reaching their respective judgments. In order to resolve the rights of the parties, it is necessary to address State Security's § 3–302 claim.

### A. Commercial Law Art. § 3–302

■ Section 3–302 of the Commercial Law Article provides, in its entirety, that the definition of a "holder in due course" is as follows:

(a) Subject to subsection (c) and § 3–106(d), "holder in due course" means the holder of an instrument if:

(1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) The holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in § 3–306, and (vi) without notice that any party has a defense or claim in recoupment described in § 3–305(a).

(b) Notice of discharge of a party, other than discharge in an insolvency proceeding, is not notice of a defense under subsection (a), but discharge is effective against a person who became a holder in due course with notice of the discharge. Public filing or recording of a document does not of itself constitute notice of a defense, claim in recoupment, or claim to the instrument.

(c) Except to the extent a transferor or predecessor in interest has rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken (i) by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding, (ii) by

purchase as part of a bulk transaction not in ordinary course of business of the transferor, or (iii) as the successor in interest to an estate or other organization.

(d) If, under § 3–303(a)(1), the promise of performance that is the consideration for an instrument has been partially performed, the holder may assert rights as a holder in due course of the instrument only to the fraction of the amount payable under the instrument equal to the value of the partial performance divided by the value of the promised performance.

(e) If (i) the person entitled to enforce an instrument has only a security interest in the instrument and (ii) the person obliged to pay the instrument has a defense, claim in recoupment, or claim to the instrument that may be asserted against the person who granted the security interest, the person entitled to enforce the instrument may assert rights as a holder in due course only to an amount payable under the instrument which, at the time of enforcement of the instrument, does not exceed the amount of the unpaid obligation secured.

(f) To be effective, notice must be received at a time and in a manner that gives a reasonable opportunity to act on it.

(g) This section is subject to any law limiting status as a holder in due course in particular classes of transactions.

Neither party argues that any subsection other than subsection (a) is applicable to the case at hand.

The first prerequisite to being deemed a holder in due course is that the item held must be an "instrument." As used in Title 3 of the Commercial Law Article, " '[i]nstrument' means a negotiable instrument." Md.Code, Com. Law Art. § 3–104. Section 3–104, in relevant part, defines "negotiable instrument":

(a) Except as provided in subsections (c) and (d), "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) Is payable on demand or at a definite time; and

(3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.

. . . .

(c) An order that meets all of the requirements of subsection (a), except paragraph (1), and otherwise falls within the definition of "check" in subsection (f) is a negotiable instrument and a check.

. . . .

(f) "Check" means (i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or teller's check. An instrument may be a check even though it is described on its face by another term, such as "money order".

The parties do not dispute that the check issued to the imposter by American General satisfies the definition of a negotiable instrument for the purposes of Title 3 of the Commercial Law Article.

Under subsection (a) of section 3–302 of the Commercial Law Article, there are multiple additional requirements that the holder of the instrument must satisfy in order to be a holder in due course. As iterated previously, those requirements are: the "instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity"; and the holder took the instrument (1) for value, (2) in good faith, (3) "without notice that the instrument is overdue or has been dishonored or that

there is an uncured default with respect to payment of another instrument issued as part of the same series," (4) without notice that the instrument contains an unauthorized signature or has been altered, (5) "without notice of any claim to the instrument described in § 3–306," and (6) "without notice that any party has a defense or claim in recoupment described in § 3–305(a)." State Security alleges that all of the requirements are satisfied in the present case. American General disputes State Security's allegations as to only one of the prerequisites—the good faith requirement.

American General argues that, because of the "suspicious circumstances" under which the imposter negotiated the check with State Security, State Security failed to satisfy the Title 3 requirement of good faith. In support of this position, American General advances five points, which, the company argues, when considered together, should defeat State Security's claim: (1) State Security's failure to develop any special procedures to validate the authenticity of large checks being presented at its check cashing business, as confirmed by the testimony of Decker and Deutsch that all checks are treated the same, regardless of amount, and that when Decker called Deutsch for assistance, Deutsch merely re-traced the steps Decker already had taken; (2) State Security "should have known that no competent businessman uses a check-cashing facility for an $18,000 check unless a stop payment order is likely" (in support of this contention, American General states:

State Security was much better positioned to detect the fraud because reasonable businessmen, while they commonly use finance companies to obtain $18,000 loans to develop property, rarely, if ever, use check-cashing services that immediately slice 3–5% off their investment to process their loans. . . .

Appellee American General, a finance company, had no reason to suspect a customer who had two years of tax returns showing he was self-employed, a high credit score, and a valid Maryland driver's license was perpetrating a crime when seeking an $18,000 loan purportedly to develop a property he owned. Appellant State Security, however, a

fee-charging check cashing service, had every reason to suspect wrongdoing when someone walked in off the street with an out-of-state $18,000 loan check and agreed to share several hundred dollars of it with State Security. Yet, seeing a hefty transaction fee, State Security turned a blind eye to these suspicious circumstances.

(footnote omitted)); (3) Wilder had not been a customer of State Security previously and was not a member of State Security's business. (*See* Md.Code, Fin. Inst. Art. § 12–120(b) (2003 Repl. Vol. & Supp. 2008) (capping check cashing service membership fees at a one-time fee of $5); (4) State Security's failure to use its thumbprint identification system, even though the system may not have been functioning at the time of the transaction, was critical because "[h]ad State Security told the impostor that it would not complete the transaction without his thumbprint, he likely would not have proceeded and looked instead for a more careless victim"; and, 5) the imposter presented the check to State Security on a Friday afternoon, "just hours before most banks and businesses closed for the weekend."

State Security retorts that, under the circumstances of this case, its actions were sufficient to satisfy the good faith statutory requirement. State Security argues:

It cannot be seriously argued that State Security did not act in good faith. There was no evidence that it had any idea that the person presenting the check was not Ronald E. Wilder. To the contrary, all the evidence points to State Security having made all commercially reasonable efforts to verify that the person presenting the check was the person who was intended to have the check. By matching the signatures on the loan documents with the signature of the person who presented the check, and by verifying that against the driver's license, State Security did all that could be expected of it.

The definition of "good faith," for the purposes of Title 3 of the Commercial Law Article, is found in Commercial Law Article § 3–103(a)(4): " 'Good faith' means honesty in fact and

the observance of reasonable commercial standards of fair dealing." Md.Code, Com. Law Art. § 3–103. Official Comment 4 to § 3–103 expounds further regarding the intended meaning of "good faith":

4. Subsection (a)(4) introduces a definition of good faith to apply to Titles 3 and 4. Former Titles 3 and 4 used the definition in Section 1–201(19). The definition in Subsection (a)(4) is consistent with the definitions of good faith applicable to Titles 2, 2A, 4, and 4A. The definition requires not only honesty in fact, but also "observance of reasonable commercial standards of fair dealing." Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction. Both fair dealing and ordinary care, which is defined in Section 3–103(a)(7), are to be judged in the light of reasonable commercial standards, but those standards in each case are directed to different aspects of commercial conduct.

Md.Code, Com. Law Art. § 3–103 cmt. 4. Professors White and Summers explain this definition of "good faith," and the commentary provided in Comment 4, as follows:

What does all of that mean? And what evidence is likely to be introduced to prove lack of reasonable commercial standards? Note that under section 3–308(b) a plaintiff confronted with defenses or claims has the burden of proving "rights of a holder in due course," and thus the burden will be on the creditor plaintiff to show good faith.

Where might this arise? One can imagine many variations on this basic theme: a depositary bank takes a check, only to have other banks say *they* would not have taken such a check and that to do so violated commercial standards. For example, would it violate commercial standards for a bank to take a $100,000 check to open an account and later to allow the depositor to withdraw the funds? If not, the bank could be a holder in due course who might take

free of a drawer's claim to that instrument even though the person with whom it dealt was a thief, not so? For reasons stated below we think the bank here would be in good faith. Can a payee violate commercial standards by demanding payment on a "demand note" where there has been no default in the underlying obligation?

Similar arguments might well arise at the closing of a kite, where one of the banks seeks to defend itself against a restitution claim by arguing it gave value in good faith and is protected by 3–418. That bank might be met with the argument that it was not a good faith holder of the checks passing through its hands because by observing reasonable commercial standards it should have understood the checks to be part of a kite. As we indicate elsewhere, we hope that few people are successful in asserting restitution causes of action after kites, but we anticipate that those arguments will be made.

Before one concludes that the banks described in the preceding paragraphs are not in good faith, return to the definition. A bank that fails to follow commercial standards is not in good faith only if it deviates from commercial standards of "fair dealing." Deviating from such standards on the side of generosity and gullibility rather than venality does not render one's act in bad faith. So beware, good faith does not require general conformity to "reasonable commercial standards," but only to "reasonable commercial standards of fair dealing." The issue is one of "unfairness" not of "negligence." If the Code is tilting back toward an objective standard, it is going only so far. We are clear on that point, but the courts are divided. As we see below, some courts insist on confusing negligence with unfairness. Some also find a duty for a depositary bank to consider the interests of all parties involved, including the drafter of the note with whom the banks has never had dealings.

2 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 17–6, at 191–92 (5th ed. 2008).

Both parties here find solace in *Any Kind Checks Cashed, Inc. v. Talcott,* 830 So.2d 160 (Fla.Dist.Ct.App.2002), a case

from the Fourth District Court of Appeal of Florida, to support their respective positions regarding the "good faith" requirement. The issue before the Florida court was whether a check cashing store, Any Kind Checks Cashed, Inc., qualified as a holder in due course of a $10,000 check written by an elderly man, John G. Talcott, Jr., where Talcott was induced fraudulently to issue the check to the person who cashed it. *Id.* at 161–62. On 10 January 2000, D.J. Rivera, a "financial advisor," called Talcott and talked him into sending a check for $10,000, made out to Salvatore Guarino, a cohort of Rivera, for travel expenses related to Rivera's handling of an investment for Talcott. *Id.* at 162. Talcott and Rivera spoke again the next day, at which time Rivera indicated that $10,000 was more than was needed for expenses, and that $5,700 would be sufficient. *Id.* As a result of that conversation, Talcott called his bank and placed a stop payment on the $10,000 check. *Id.*

Despite the 11 January conversation between Talcott and Rivera, Guarino appeared at Any Kind's office in Stuart, Florida, on 11 January and presented the $10,000 check. *Id.* The store supervisor, Nancy Michael, who had the authority to approve checks over $2,000, examined Guarino's driver's license and the Federal Express envelope from Talcott in which Guarino received the check. *Id.* She asked Guarino the purpose of the check, and, consistent with the information on Guarino's customer card with Any Kind, he informed her that he was a broker and that the maker of the check sent it to him for investment purposes. *Id.* Michael was unable to contact Talcott by telephone. *Id.* Believing that the check was good, based on her experience, and the fact that it was sent to Guarino, the payee, in the Federal Express envelope, Michael cashed the check for Guarino for the $10,000 amount, minus a 5% check cashing fee. *Id.*

On 15 January 2000, Rivera called Talcott and asked about the requested $5,700. *Id.* That same day, Talcott sent a check for that amount, under the impression that Rivera knew that Talcott had stopped payment on the $10,000 check. *Id.* On 17 January, Guarino went into Any Kind and presented the $5,700 check to the teller on duty at the time, Joanne Kochaki-

an. *Id.* Guarino also presented the Federal Express envelope in which the check had come. *Id.* Any Kind's company policy required a supervisor to approve a check over $2,000. *Id.* Kochakian noticed that Michael approved previously the $10,000 check, and called Michael, who was working at another location, to notify her of the $5,700 check. *Id.*

Any Kind did not have any written procedures that a supervisor was required to follow in determining whether to cash a check over $2,000. *Id.* Michael possessed the discretionary power to decide whether a presented check was "good." *Id.* On this occasion, Michael instructed Kochakian not to cash the check until she contacted the drawer, Talcott, and obtained approval. *Id.* at 163. Kochakian was able to reach Talcott by telephone, and Talcott approved cashing the $5,700 check. *Id.*

On 19 January, Rivera called Talcott to inform him that Guarino was a thief. *Id.* Talcott immediately contacted his bank and stopped payment on the $5,700 check. *Id.* The trial court found that there was no dispute that Guarino and Rivera had scammed Talcott by inducing him to issue both checks. *Id.*

Any Kind filed a two-count complaint against Guarino and Talcott, alleging that it was a holder in due course of both checks. *Id.* The trial court found in favor of Any Kind regarding the $5,700 check, but in favor of Talcott as to the $10,000 check. *Id.* The trial court found that the circumstances surrounding the cashing of the $10,000 check were sufficient to put Any Kind on notice that "some confirmation or explanation should be obtained." *Id.*

On review, the Florida appellate court affirmed the judgment of the trial court, finding that Any Kind was not a holder in due course of the $10,000 check because the company did not act "in good faith," within the meaning provided in Florida's commercial law statute.[7] *Id.* at 168. Citing Drysdale and

---

7. Florida's definition of "good faith" for the purpose of determining a holder in due course, identical to that of Maryland's in the present case,

Keest's study[8] as support for the proposition that check cashing businesses are a "major source of traditional banking services for low-income and working poor consumers, residents of minority neighborhoods, and people with blemished credit histories"[9] and businesses targeted to locations in which "traditional banks fear to tread"[10], and noting on its own accord that check cashing businesses typically cash "small" checks, such as "a paycheck, child support, social security, or public assistance check"[11] and are businesses whose "[a]ttractions ... are convenience and speed"[12], the court concluded:

> [W]e cannot say that the trial court erred in finding that the $10,000 check was a red flag. The $10,000 personal check was not the typical check cashed at a check cashing outlet. The size of the check, in the context of the check cashing business, was a proper factor to consider under the objective standard of good faith in deciding whether Any Kind was a holder in due course. *See [Me. Family Fed. Credit Union v. Sun Life Assurance Co. of Can.,* 727 A.2d 335, 344 (Me.1999)].

Guarino was not the typical customer of a check cashing outlet. As the trial judge observed, because of the 5% fee charged, it is unusual for a small businessman such as a broker to conduct business through a check cashing store instead of through a traditional bank. Guarino did not have

---

is found in Fla. Stat. Ann. § 673.1031(1)(d) (LexisNexis 2009). That definition was adopted in Florida in 1992 as part of a wholesale revision of the Uniform Commercial Code, and took effect 1 January 1993. *See* 1992 Fla. Laws ch. 82.

8.   Lynn Drysdale & Kathleen E. Keest, *The Two–Tiered Consumer Financial Services Marketplace: The Fringe Banking System and its Challenge to Current Thinking About the Role of Usury Laws in Today's Society,* 51 S.C. L.Rev 589 (2000).

9.   *Talcott,* 830 So.2d at 166; *see* Drysdale & Keest, *supra,* at 591.

10.   *Talcott,* 830 So.2d at 166–67; *see* Drysdale & Keest, *supra,* at 629.

11.   *Talcott,* 830 So.2d at 167.

12.   *Talcott,* 830 So.2d at 167.

a history with Any Kind of cashing checks of similar size without incident. The need for speed in a business transaction is usually less acute than for someone cashing a paycheck or welfare check to pay for life's necessities. The need for speed in cashing a large business check is consistent with a drawer who, for whatever reason, might stop payment. Fair dealing in this case required that the $10,000 check be approached with a degree of caution.

If a drawer has a right to stop payment of a check, and a traditional bank usually places a hold on uncollected funds after a payee deposits a check into an account, then the legal dispute after a stop payment will usually be between the drawer of the check and the payee, the two parties that had the dealings leading to the payment. Thus, where a check is cashed at a bank or savings and loan, the law will often place the loss on the wrongdoer in the underlying transaction. This is a desirable goal.

When a check cashing store releases funds immediately, the holder in due course doctrine steps in, frequently putting the loss on a wronged maker, in furtherance of the policy that facilitating the transfer of checks benefits the economy. In this case, the policy reasons behind easy negotiability do not outweigh the reasons for caution. Very loose application of the objective component of "good faith" would make check cashing outlets the easy refuge of scam artists who want to take the money and run. The concept of "fair dealing" includes not being an easy, safe harbor for the dishonest.

*Id.* at 167–68.

Arguing that the policy rationale of *Talcott,* in particular the *Talcott* court's association that the need for speed in cashing a large business check "is consistent with a drawer who, for whatever reason, might stop payment," American General contends that the ersatz Wilder's negotiation of the $18,000 check for a 3–5% fee at a check cashing store should have put State Security on "inquiry notice that some confirmation or explanation should be obtained," and that because State Security applied the same level of scrutiny to checks presented,

regardless of their amounts, State Security "makes itself a magnet for impostors," thereby shedding its ability to claim "good faith."

State Security responds by noting a factual distinction between the situation presented in *Talcott* and the situation here. It points out that in *Talcott* the appellate court affirmed the trial court's holding that the check cashing store was a holder in due course of the $5,700 check, but not the $10,000 check. State Security interprets the Florida court's opinion as indicating that the real issue was whether, under the circumstances presented there, the check cashing company should have verified with the maker of the $10,000 check that the $10,000 check was valid. Had the check cashing store asked Talcott whether the $10,000 check was valid when it was presented by Guarino, it would have learned that Talcott had placed a stop payment order on it. In contrast, by confirming with Talcott, the drawer, that the $5,700 check was valid at the time it was presented, the check cashing store satisfied the good faith requirement for a holder in due course.

Thus, not surprisingly, State Security reasons that the relevant inquiry in the present case is whether it took adequate steps before cashing the check to ensure that the $18,000 check issued by American General was valid. State Security posits that "[j]ust as [the check cashing store in *Talcott*] was not required to make sure that Mr. Talcott was not the victim of a scam, so too, State Security cannot be legally obligated to determine that American General should not have wanted to issue the check it issued." It points here to the testimony of Toland, American General's Branch Manager, who stated that, had State Security called him, he would have verified that the check represented the proceeds of a loan transaction American General had closed with someone it believed to be Wilder. Based on this distinction, State Security argues that *Talcott* actually supports a finding of good faith here because had State Security contacted American General regarding the validity of the check presented by the imposter, it would have learned only that the check was valid.

Professors White and Summers express some skepticism at how many courts have viewed check cashing businesses with regard to the good faith requirement for a holder in due course:

Check cashing companies appear to be the pariahs of holder in due course law. In *Buckeye Check Cashing, Inc. v. Camp,* [159 Ohio App.3d 784, 825 N.E.2d 644 (2005),] a check cashing company sued drawer for payment after drawer contacted his bank and ordered the bank to stop payment. Drawer of check had negotiated with a contractor for services to be completed over the next three days and drawer drafted a post-dated check as payment. (The check bore the date of the projected date of completion of the services.) Contractor immediately cashed check with plaintiff, who submitted the check for payment. The drawer, fearing services would not be completed, contacted his bank the same day and ordered it to stop payment. The court held that the future date on the check should have put the check cashing company on notice that the check might not be good. The court also held that the company failed to act in a commercially reasonable manner, and did not take the check in "good faith," when it did not attempt to verify the check. We are less certain than the court is about the commercial practice with respect to postdated checks. In some circumstances it might be commercially unreasonable to take a postdated check over-the-counter without some explanation from the customer, but that surely would not be true of a check presented to an ATM.

In *Any Kind Checks Cashed, Inc. v. Talcott,* a court held that the check cashing service did not act in good faith and should have verified a $10,000 check drawn on a 93 year-old's account when presented for cashing by a financial broker. "[The] procedures followed were not reasonably related to achieve fair dealing, . . . taking into consideration all of the participants in the transaction." The court held that the financial broker was not the typical customer of a check cashing outlet because small businessmen rarely use a check cashing service that charges a 5% fee instead of a

traditional bank. The business check is not the welfare or payroll check usually cashed at such an establishment. The court held that the need for speed in cashing a large business check is consistent with a drawer who might stop payment and fair dealing requires that the $10,000 check be approached with caution. "The concept of 'fair dealing' includes not being an easy, safe harbor for the dishonest."

Both the Buckeye Check–Cashing case and the Any Kind Checks Cashed case show courts that are quick to deny holder in due course status to check cashing facilities. We wonder how these courts would have handled these cases had the plaintiffs been banks and not check cashing facilities. In effect the courts are asking check cashers to adhere to a higher standard than might be required of a bank. Given the clientele of check cashing facilities, the courts' skepticism might be justified, but we would like to see a little more evidence that check-cashing facilities are a home for persons engaged in fraudulent behavior before we would subject them to higher standards than might be applied to a bank.

WHITE & SUMMERS, *supra*, § 17–6, at 197–98 (footnotes omitted).

██ Under § 3–308(b),[13] the burden is on a plaintiff to prove "rights of a holder in due course," including situations

---

13. Maryland Code, Commercial Law Art. § 3–308 provides:

(a) In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature. If an action to enforce the instrument is brought against a person as the undisclosed principal of a person who signed the instrument as a party to the instrument, the plaintiff has the burden of establishing that the defendant is liable on the instrument as a represented person under § 3–402(a).

(b) If the validity of signatures is admitted or proved and there is compliance with subsection (a), a plaintiff producing the instrument

such as the present, where the defense is that the plaintiff did not take the instrument in good faith. WHITE & SUMMERS, *supra*, § 17–6, at 191; *see* Md.Code, Com. Law Art. § 3–308 cmt. 2 ("Subsection (b) means only that if the plaintiff claims the rights of a holder in due course against the defense or claim in recoupment, the plaintiff has the burden of proof on that issue."). We conclude here that State Security is entitled to enforce the check because it has met its burden of proving that it took the check in good faith.

The core of the dispute between banking institutions over the good faith requirement most often distills to one banking institution taking a check, only to have another banking institution charge that, under the circumstances, it would not have taken that check, and that taking the check was a violation of commercial standards. *See* WHITE & SUMMERS, *supra*, § 17–6, at 191 ("Where might th[e good faith issue] arise? One can imagine many variations on this basic theme: a depositary bank takes a check, only to have other banks say *they* would not have taken such a check and that to do so violated commercial standards."). This is the dispute presented in the present case, albeit not between two banks.

Here, unlike in *Talcott* where the check presented to the check cashing business was a personal check sent via Federal Express, State Security took a check, issued by American General to the imposter in person, and relied on much of the same documentation and/or identification that American General had relied on in giving the imposter the loan proceeds check in the first place.[14] That the check presented in this

---

is entitled to payment if the plaintiff proves entitlement to enforce the instrument under § 3–301, unless the defendant proves a defense or claim in recoupment. If a defense or claim in recoupment is proved, the right to payment of the plaintiff is subject to the defense or claim, except to the extent the plaintiff proves that the plaintiff has rights of a holder in due course which are not subject to the defense or claim.

14. Toland testified that American General required the following from the imposter in processing and approving his loan application: a paper application, personal tax returns for 2005 and 2006, a credit report, driver's license, references, and signed loan documents. Decker, State

case was a check drawn by American General, a financial institution, is a significant distinction from that of the personal check presented in *Talcott* for two reasons: the check itself was more likely to be valid, including the drawer's signature, as confirmed by State Security's comparing it to prior American General checks it had cashed; and the payee of the check was more likely to have been subjected to an examination of her or his personal identification, credit-worthiness, and purpose for taking out the loan, as confirmed by State Security's review of the driver's license presented and the loan documents before cashing the check.

American General's position that State Security did not take the check in good faith seems anomalous when State Security relied on the same document for personal identification, as well as the loan documents that American General generated in issuing the check to the imposter, when cashing the check.[15] Because the check was issued by American General as the proceeds of a loan, a transaction verified by State Security,[16]

Security's teller, testified that State Security required the following in cashing the imposter's check: the check, which was verified for authenticity against other American General checks State Security had cashed, driver's license, and the American General loan documents, which were used to verify the name and signature with those on the check.

**15.** State Security, however, did not require the imposter to present the 2005 and 2006 tax returns, nor did it run a credit check. American General does not allege how either of those actions, had they been taken on State Security's part, would affect the outcome in this case. Presumably, had these things been done by State Security, it would have yielded the same satisfactory results as were found by American General.

**16.** The fact that State Security examined the loan documents to verify that the check presented by the imposter was the proceeds of a valid loan issued by American General reduced substantially the possibility that the check presented was issued or obtained by an unauthorized means, such as by an American General employee having drawn the check fraudulently to the third party as payment of a business debt or as a check for salary or wages. We do not consider of sufficient significance to alter our conclusions the fact that State Security did not call American General to confirm that the check represented the proceeds of a valid loan because Thurman Toland, American General's Branch Manager, testified that had State Security called, he would have

adoption of American General's position would require us to hold State Security, a check cashing business, to a higher commercial standard than American General, simply because the financial institution was duped into issuing the check to an imposter.

American General's desire that we hold the check cashing company here to a higher standard shall not carry the day.[17] First, although it may be "unusual" for a person in the imposter's situation to use a check cashing business, instead of a traditional bank, *Talcott*, 830 So.2d at 168–69, whatever inhering "unusualness" does not inexorably negate good faith on State Security's part. State Security examined the same document of identification of the imposter (the forged driver's license), as well as the accompanying loan documents American General had prepared, to verify that the check presented by the imposter was the proceeds of a loan issued validly by American General, with the imposter as the intended payee, before cashing the check.

The other four points of concern advanced by American General are too speculative to alter our analysis. The fact that State Security "has no special procedures to validate large checks" is irrelevant for two reasons: a) the procedures State Security did utilize were quite similar to that of American General; and b) American General presented no evidence of any procedure State Security was "lacking" when it cashed the imposter's check that, if present, should have persuaded State Security to proceed other than as it did. Second, the fact

---

confirmed that the check was the proceeds of a valid loan. American General does not allege that State Security's reliance on the loan documents presented by the imposter when cashing the check was unreasonable or misguided on any level.

17. Of the five points American General advances as to why State Security did not take the check in good faith, the only one that seems to address the good faith requirement is the notion that State Security should have known that no reasonable businessperson would use a check cashing business to cash an $18,000 check unless a stop payment order was likely. The other four points seem to address the "ordinary care" element of § 3–404(d). Nonetheless, we shall address these points here.

that Ronald E. Wilder had not been a customer of State Security previously is irrelevant because of the verification steps State Security took before cashing the check, and because it does not appear from the record that American General itself was familiar with Wilder before the transactions in question. Third, we find American General's assertion that, had State Security asked the imposter to submit a thumbprint, the imposter likely would not have proceeded, to be the most speculative argument of all. The testimony in the record reveals that State Security's thumbprint machine may not have been working at the time and, in any event, because the machine was not connected to any centralized database, the thumbprint could be effective only in identifying the imposter after the fact or for future transactions at State Security. Without any supporting evidence, we do not accept American General's bald assertion that this imposter, who obtained and utilized two years of tax returns and other personal identification information for Mr. Wilder, would have been dissuaded from accomplishing the final step of an identity theft by being asked for his thumbprint.[18] And fourth, the fact that the

---

**18.** American General relies on *Messing v Bank of America, N.A.*, 373 Md. 672, 821 A.2d 22 (2003), to support its position that, had State Security asked the imposter for his thumbprint before cashing the check, the imposter likely would not have proceeded. In *Messing*, we concluded that Bank of America's policy of requiring non-customer payees to submit thumbprints before the Bank would cash checks drawn on Bank of America accounts in the Bank's branches was a reasonable step in protecting the Bank against potential losses. *Id.* at 702, 821 A.2d at 39. In reaching that conclusion, we quoted a policy rationale advanced in the Court of Special Appeals's opinion in *Messing*:

> While providing a thumbprint signature does not necessarily confirm identification of the checkholder at presentment—unless of course the drawee bank has a duplicate thumbprint signature on file—it does assist in the identification of the checkholder should the check later prove to be bad. It therefore serves as a powerful deterrent to those who might otherwise attempt to pass a bad check.

*Id.* at 700, 821 A.2d at 38 (quoting *Messing v. Bank of Am., N.A.*, 143 Md.App. 1, 16, 792 A.2d 312, 321 (2002), *aff'd*, 373 Md. 672, 821 A.2d 22 (2003)). Although being asked for a thumbprint may serve as a powerful deterrent to those attempting to pass bad checks, we cannot accept American General's position here, without more support, that an imposter, who already went to the lengths of securing two years of Mr.

imposter presented the check at State Security on a Friday afternoon is equally likely to be coincidental, in light of the substantial identity theft actions undertaken, with the timing of his receipt of the check from American General—that same Friday afternoon—than with the conclusion that the timing was premeditated because the weekend was near.

We conclude therefore that State Security overcame American General's defense of a lack of good faith, as required under § 3–308(b), and, thus, that State Security took the check from the imposter in "good faith," defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Md.Code, Com. Law Art. § 3–103. As State Security indicates, there was no evidence at the time the check was presented that the person presenting the check was not the true Ronald E. Wilder, and State Security, as we have concluded, took commercially reasonable efforts to verify that the person presenting the check was the person who was intended to have the check as the proceeds of a valid loan issued by American General. Because we conclude that State Security took the check in "good faith," and American General does not dispute any of the other requirements for State Security to be considered a holder in due course of the check, we resolve that State Security was a holder in due course of the check cashed by the imposter.[19]

### B. Commercial Law Art. § 3–404

Commercial Law Art. § 3–404 addresses the circumstances,

---

Wilder's tax returns and much of his personal information for the forged driver's license and credit applications, likely would have stopped short of completing this theft by being asked for his thumbprint.

19. The effect of being a holder in due course is provided in § 3–306:

A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. A person having rights of a holder in due course takes free of the claim to the instrument.

among other situations, of imposters.[20]  Md.Code, Com. Law
Art. § 3–404.   Regarding our imposter in the present case,
the District Court ruled, under § 3–404(d), that State Security
did not exercise ordinary care in paying the check presented
by him, and that the failure to exercise such care contributed
substantially to the loss.   The Circuit Court, in affirming that
judgment, concluded that there was substantial evidence to
support the District Court's finding, and therefore the District
Court's finding was not clearly erroneous.

The scope of appellate review of an appeal taken on the
record from the District Court, with regards to that court's
findings of fact, is the same as that provided under former

---

**20.** As noted above, the entirety of Commercial Law Art. § 3–404 pro-
vides:

(a) If an impostor, by use of the mails or otherwise, induces the
issuer of an instrument to issue the instrument to the impostor, or to
a person acting in concert with the impostor, by impersonating the
payee of the instrument or a person authorized to act for the payee,
an indorsement of the instrument by any person in the name of the
payee is effective as the indorsement of the payee in favor of a person
who, in good faith, pays the instrument or takes it for value or for
collection.

(b) If (i) a person whose intent determines to whom an instrument
is payable (§ 3–110(a) or (b)) does not intend the person identified as
payee to have any interest in the instrument, or (ii) the person
identified as payee of an instrument is a fictitious person, the follow-
ing rules apply until the instrument is negotiated by a special indorse-
ment:

(1) Any person in possession of the instrument is its holder.

(2) An indorsement by any person in the name of the payee stated
in the instrument is effective as the indorsement of the payee in favor
of a person who, in good faith, pays the instrument or takes it for
value or for collection.

(c) Under subsection (a) or (b), an indorsement is made in the
name of a payee if (i) it is made in a name substantially similar to that
of the payee or (ii) the instrument, whether or not indorsed, is
deposited in a depositary bank to an account in a name substantially
similar to that of the payee.

(d) With respect to an instrument to which subsection (a) or (b)
applies, if a person paying the instrument or taking it for value or for
collection fails to exercise ordinary care in paying or taking the
instrument and that failure substantially contributes to loss resulting
from payment of the instrument, the person bearing the loss may
recover from the person failing to exercise ordinary care to the extent
the failure to exercise ordinary care contributed to the loss.

Maryland Rule 1386, now embodied in current Maryland Rule 8–131(c). *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834, 836 (1975). Maryland Rule 8–131(c) provides:

(c) Action tried without a jury. When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Md. Rule 8–131(c). In *$3,417.46 U.S. Money v. Kinnamon,* 326 Md. 141, 604 A.2d 64 (1992), we elaborated:

In *Ryan v. Thurston,* 276 Md. 390, 391–92, 347 A.2d 834 (1975), we analogized the scope of review of a circuit court under Maryland Rule 1386 to that possessed by this Court and the Court of Special Appeals under former Maryland Rules 886 and 1086 (the provisions of both now being contained in Maryland Rule 8–131(c)). *See Housing Comm'n v. Lacey,* 322 Md. 56, 59, 585 A.2d 219 (1991). These rules have been consistently interpreted in our cases to require that appellate courts accept and be bound by findings of fact of the lower court unless they are clearly erroneous. And as we said in *Ryan v. Thurston, supra,* 276 Md. at 392, 347 A.2d 834, "[t]he appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed." Moreover, as we reiterated in *Housing Comm'n v. Lacey, supra,* 322 Md. at 59–60, 585 A.2d 219, the trial court is not only the judge of a witness's credibility but also of the weight to be attached to the evidence. It is thus plain that the appellate court should not substitute its judgment for that of the trial court on its findings of fact but will only determine whether those findings are clearly erroneous in

light of the total evidence. *See Kowell Ford, Inc. v. Doolan,* 283 Md. 579, 584, 391 A.2d 840 (1978).

*Kinnamon,* 326 Md. at 149, 604 A.2d at 67–68.

■■ We review the trial court's application of law to the facts, however, for legal error (a non-deferential standard). *See Liddy v. Lamone,* 398 Md. 233, 247, 919 A.2d 1276, 1285 (2007) ("With respect to the standard of review for mixed questions of fact and law, in *Bowers v. Eastern Aluminum Corp.,* on the other hand, we held that this Court must affirm the trial court's decision on mixed questions of fact and law when 'we cannot say [that its findings] were clearly erroneous[,] . . . [a]nd we find no error in [its] application of the law to the facts.' 240 Md. 625, 214 A.2d 924 (1965)."). Similarly, we review the trial court's pure conclusions of law under the *de novo* standard. *See id.* at 246–47, 919 A.2d at 1285 ("In addition, this Court has held that questions of law, *i.e.* whether the facts taken together are sufficient to sustain the defense of laches, are subject to review under the *de novo* standard.") (citations omitted). In the present case, we find, for the reasons that follow, that the District Court erred as a matter of law in concluding that State Security did not meet the statutory standard of ordinary care, and that the failure to exercise ordinary care contributed substantially to the loss. Hence, the Circuit Court erred in affirming the judgment of the District Court.

■ The District Court determined initially and correctly that the imposter rule applies in this case because all of the pertinent requirements of Commercial Law Art. § 3–404(a) were present. As noted, *supra,* § 3–404(a) provides:

(a) If an impostor, by use of the mails or otherwise, induces the issuer of an instrument to issue the instrument to the impostor, or to a person acting in concert with the impostor, by impersonating the payee of the instrument or a person authorized to act for the payee, an indorsement of the instrument by any person in the name of the payee is

effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.

Md.Code, Com. Law Art. § 3–404(a). Although "imposter" is not defined in the Commercial Law Article, in *Bank of Glen Burnie v. Elkridge Bank*, 120 Md.App. 402, 707 A.2d 438 (1998), the Court of Special Appeals concluded that " '[i]mposter' is defined as 'one who poses as another to obtain benefits under a negotiable instrument.' " *Bank of Glen Burnie*, 120 Md.App. at 408–09, 707 A.2d at 441 (citing BLACK'S LAW DICTIONARY 756 (6th ed. 1991)). There is no doubt that, by appearing in person at both American General and State Security to conduct transactions, which included the presentation of a forged driver's license with the imposter's picture, but the name and personal identification information of Ronald E. Wilder, the individual in this case was a person who posed as another to obtain the benefits of the check issued by American General. There also is no doubt that, by posing as Mr. Wilder, the imposter induced American General to issue the check to him. When the imposter negotiated the check at State Security, he indorsed the check in the name of the check's payee, Ronald E. Wilder.[21] As we have concluded already, *supra,* State Security took the instrument in good faith. Thus, our reversal of the judgments below turns on the interpretation of the remaining pertinent subsection, subsection (d), of § 3–404.

■ As quoted, *supra,* § 3–404(d) provides:

(d) With respect to an instrument to which subsection (a) or (b) applies, if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the person bearing the loss may recover from the

---

**21.** The imposter's indorsement of the check, in the name of Mr. Wilder, satisfied subsection (c) of § 3–404, a matter not disputed here.

person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

Md.Code, Com. Law Art. § 3–404(d).[22] "Ordinary care" is defined in § 3–103(a)(7):

(7) "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's

---

**22.** We pause to note that the parties here are in the inverse position of the typical § 3–404(d) scenario. State Security, the party that bore the original loss, sued American General, which interposed § 3–404(d) as a defense for the stop payment order it placed on the check that it drew in this case, the check State Security is seeking to enforce. Section 3–404(d) states that "the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss." Md.Code, Com. Law Art. § 3–404(d). Thus, the scenario § 3–404(d) typically contemplates would be if American General's check had been honored and paid to State Security, with American General subsequently bringing an action against State Security under § 3–404(d) seeking damages for State Security's alleged negligence in cashing the check. Regardless, the inverse scenario presented here achieves the same result because under either scenario the intent of subsection (d) is achieved: allocation of loss among the parties based upon each party's respective comparative negligence. As Professors White and Summers explain:

Although 3–406 and 4–406 have always had a provision that diminished (even to zero) a bank's rights if it was negligent, that was not true of 3–405 until 1990. In the absence of a stated contributory negligence standard in former 3–405 (and despite our arguments to the contrary), courts mostly held that the depositary bank's negligence was not relevant in a case under former 3–405. This was so even though negligence contributing to the loss could easily be committed by a bank that cashed or took a padded payroll check for deposit. The 1990 revision changed that. The preclusions in 3–404 and 3–405 are both subject to a comparative negligence standard similar to that described above with respect to 3–406.

WHITE & SUMMERS, *supra*, § 19–4, at 305 (footnote omitted).

procedures do not vary unreasonably from general banking usage not disapproved by this title or Title 4.

Md.Code, Com. Law Art. § 3–103(a)(7).

Official Comment 3 to § 3–404 addresses expressly the default allocation of loss in circumstances such as the present one. Comment 3 provides:

3. In cases governed by subsection (a) the dispute will normally be between the drawer of the check that was obtained by the impostor and the drawee bank that paid it. The drawer is precluded from obtaining recredit of the drawer's account by arguing that the check was paid on a forged indorsement so long as the drawee bank acted in good faith in paying the check. Cases governed by subsection (d) are illustrated by Cases # 1 through # 5 in Comment 2. *In Cases # 1, # 2, and # 3 there is no forgery of the check, thus the drawer of the check takes the loss if there is no lack of good faith by the banks involved.* Cases # 4 and # 5 are forged check cases. Depositary Bank is entitled to retain the proceeds of the check if it didn't know about the forgery. Under Section 3–418 the drawee bank is not entitled to recover from Depositary Bank on the basis of payment by mistake because Depositary Bank took the check in good faith and gave value for the check when the credit given for the check was withdrawn. And there is no breach of warranty under Section 3–417(a)(1) or (3) or 4–208(a)(1) or (3). Unless Section 3–406 applies the loss is taken by the drawee bank if a forged check is paid, and that is the result in Case # 5. In Case # 4 the loss is taken by Corporation, the drawer, because an agreement between Corporation and the drawee bank allowed the bank to debit Corporation's account despite the unauthorized use of the check-writing machine.

*If a check payable to an impostor, fictitious payee, or payee not intended to have an interest in the check is paid, the effect of subsections (a) and (b) is to place the loss on the drawer of the check rather than on the drawee or the Depositary Bank that took the check for collection. Cases governed by subsection (a) always involve fraud, and fraud*

*is almost always involved in cases governed by subsection (b). The drawer is in the best position to avoid the fraud and thus should take the loss. This is true in Case # 1, Case # 2, and Case # 3. But in some cases the person taking the check might have detected the fraud and thus have prevented the loss by the exercise of ordinary care. In those cases, if that person failed to exercise ordinary care, it is reasonable that that person bear loss to the extent the failure contributed to the loss. Subsection (d) is intended to reach that result. It allows the person who suffers loss as a result of payment of the check to recover from the person who failed to exercise ordinary care. In Case # 1, Case # 2, and Case # 3, the person suffering the loss is Corporation, the drawer of the check. In each case the most likely defendant is the depositary bank that took the check and failed to exercise ordinary care. In those cases, the drawer has a cause of action against the offending bank to recover a portion of the loss. The amount of loss to be allocated to each party is left to the trier of fact. Ordinary care is defined in Section 3–103(a)(7).* An example of the type of conduct by a depositary bank that could give rise to recovery under subsection (d) is discussed in Comment 4 to Section 3–405. That comment addresses the last sentence of Section 3–405(b) which is similar to Section 3–404(d).

In Case # 1, Case # 2, and Case # 3, there was no forgery of the drawer's signature. But cases involving checks payable to a fictitious payee or a payee not intended to have an interest in the check are often forged check cases as well. Examples are Case # 4 and Case # 5. Normally, the loss in forged check cases is on the drawee bank that paid the check. Case # 5 is an example. In Case # 4 the risk with respect to the forgery is shifted to the drawer because of the agreement between the drawer and the drawee bank. The doctrine that prevents a drawee bank from recovering payment with respect to a forged check if the payment was made to a person who took the check for value and in good faith is incorporated into Section 3–418 and Sections 3–417(a)(3) and 4–208(a)(3). This doctrine is

based on the assumption that the depositary bank normally has no way of detecting the forgery because the drawer is not that bank's customer. On the other hand, the drawee bank, at least in some cases, may be able to detect the forgery by comparing the signature on the check with the specimen signature that the drawee has on file. But in some forged check cases the depositary bank is in a position to detect the fraud. Those cases typically involve a check payable to a fictitious payee or a payee not intended to have an interest in the check. Subsection (d) applies to those cases. If the depositary bank failed to exercise ordinary care and the failure substantially contributed to the loss, the drawer in Case # 4 or the drawee bank in Case # 5 has a cause of action against the depositary bank under subsection (d). Comment 4 to Section 3–405 can be used as a guide to the type of conduct that could give rise to recovery under Section 3–404(d).

Md.Code, Com. Law Art. § 3–404 cmt. 3 (emphasis added). As Official Comment 3 indicates, the default loss in cases involving imposters lies with the drawer because the drawer is the party that dealt directly with the imposter and thus was in the best position to detect the fraud. *Cf. Dominion Bank, N.A. v. Household Bank, F.S.B.*, 827 F.Supp. 463, 466–67 (S.D.Ohio 1993) ("The loss is shifted to the drawer, because the drawer is presumed to have been in the best position to have prevented the fraud. The rationale supporting the impostor rule is essentially the same as that supporting the general rule: the party with the closest contact with the forger ought to bear the responsibility for the loss occasioned by the forgery."); *N. Side State Bank v. Bd. of County Comm'rs*, 894 P.2d 1046, 1053 (Okla.1994) ("Known as the "impostor rule," § 3–405(1)(a) creates an exception to the general notions that govern forged documents. This is so because this section places the loss on the drawer when one who impersonates a third person fraudulently induces the drawer to issue a check and places him in possession. The drawer in that scenario is in the best position to prevent forgery by exercising reasonable care in identifying the party

for whom the check is to be issued.") (footnotes omitted); *Fair Park Nat'l Bank v. Sw. Inv. Co.*, 541 S.W.2d 266, 269–70 (Tex.Civ.App.1976) ("This interpretation is consistent with the policy of the impostor rule, which is to throw the loss resulting from dealing with an impostor on the person who dealt with the impostor, and, presumably, had the best opportunity to take precautions that would have detected the fraud, rather than on a subsequent holder, who had no similar opportunity.") (citations omitted).[23] In certain situations, a drawer may reduce its loss by recovering damages from a person who failed to exercise ordinary care in paying the instrument or taking it for value or collection, if that failure contributed substantially to loss resulting from payment of the instrument, to the extent the failure to exercise care contributed to the loss. Md.Code, Com. Law Art. § 3–404(d).

The District Court's ruling in favor of American General erred in two respects: a) the ruling is not in accord with the statutory definition of "ordinary care," in light of the uncontradicted testimony of Deutsch, State Security's compliance officer, and b) the ruling erred by shifting the default burden of loss in an imposter case to the subsequent holder, State Security, rather than the party who was in the best position to detect the fraud, the drawer, American General.

With regard to the interpretation of "ordinary care," the statutory definition of "ordinary care" contains three elements: 1) observance of reasonable commercial standards, 2) which prevail in the area in which the person is located, 3) with respect to the business in which the person is engaged. Md.Code, Com. Law Art. § 3–103(a)(7). In the proceedings before the District Court, the testimony of Deutsch, the

---

**23.** American General indicates correctly that these three cases were decided under a version of the imposter rule in the Uniform Commercial Code (as adopted in these jurisdictions) that did not include the ordinary care exception. The addition of the ordinary care exception to the imposter rule does not render these authorities unpersuasive, as American General argues, because Official Comment 3 to § 3–404 reiterates the policy that the default loss in imposter cases is on the party best able to prevent the loss, the drawer.

manager who "run[s] State Security Check Cashing," bore directly upon State Security's conduct on the day in question and, more generally, upon State Security's general business procedures in the check cashing business. Deutsch testified that he has been involved in the check cashing business for twenty-two years and that he had occasion to cash "large" checks in the past. American General did not challenge Deutsch's testimony on cross-examination, nor did American General offer any countervailing testimony reflecting upon State Security's conduct in light of its business practices or the location of its branch office. The only testimony American General elicited on point was through cross-examination of Wanda Decker, State Security's clerk, who testified that State Security, before disbursing, does not hold a check (regardless of the amount) to ascertain whether the funds are available. That testimony alone, however, does not diminish State Security's conduct in the matter in question. Thus, American General did not present sufficient evidence at trial to establish that State Security's conduct lacked "ordinary care" under the statutory definition.[24]

---

**24.** At oral argument before us, counsel for American General acknowledged that no evidence was offered by it as to impropriety of any of State Security's business practices. Counsel indicated correctly, however, that in *Talcott*, the Florida appellate court was presented with a similar situation, in that no evidence was presented at trial concerning the check cashing industry's commercial standards. *Talcott*, 830 So.2d at 166. The Florida court accepted, as an apparent alternative, scholarly studies regarding the niche occupied by check cashing businesses in the banking and financial industry. *See id.* at 166–68. Counsel for American General suggested that we adopt the discussion of the check cashing industry by the Florida appellate court in *Talcott*. Even were we to accede to that suggestion, it would be of no help to American General because American General would still not have presented any evidence reflecting whether State Security's conduct here lacks commercial reasonableness, particularly due to the fact that the *Talcott* court limited its analysis exclusively to the "good faith" requirement. *See id.* at 166 ("Even assuming that Any Kind's procedures for checks over $2,000 met the industry's gold standard, we hold that in this case the procedures followed were not reasonably related to achieve fair dealing with respect to the $10,000 check, taking into consideration all of the participants in the transaction, Talcott, Guarino, and Any Kind.").

With regard to the burden of loss, the District Court imagined that the one action either party could have taken to prevent the loss was for State Security to have withheld payment until American General's check cleared. The trial court concluded that State Security chose not to delay the payment because it earned a fee from cashing the check, and that in so doing, it ran the risk that the check may be dishonored.

Simply put, the conclusion the trial court reached does not comport with sustainable "ordinary care" analysis. That a business charges a fee for the utilization of its services, albeit here a check cashing business, for cashing the check, is not determinative of whether the conduct of that business on the occasion in question lacked "ordinary care." Under the circumstances of this case, the trial court's reasoning seems directed more towards the "good faith," rather than the "ordinary care," requirement. As Judge Easterbrook stated succinctly in *State Bank of the Lakes v. Kansas Bankers Surety Co.*, 328 F.3d 906 (7th Cir.2003):

> "[G]ood faith" is in a different phylum from "due care" . . . .
> Article 3 of the UCC, which contains a definition of "good faith[,]" . . . links commercial reasonableness to "fair dealing." Avoidance of advantage-taking, which this section is getting at, differs from due care.

*Id.* at 909. The trial court seemed persuaded that by cashing the check for a percentage fee, State Security took unfair advantage of the situation. We have already rejected, *supra*, however, American General's claim that State Security's taking the check from the imposter in the circumstances noted above lacked "good faith."

More significantly, the trial court's ruling in favor of American General is contrary to the position emphasized in Official Comment 3 of § 3–404 that "[i]f a check payable to an impostor . . . is paid, the effect of subsections (a) and (b) is to place the loss on the drawer of the check rather than on the drawee or the Depositary Bank that took the check for collection." Md.Code, Com. Law Art. § 3–404 cmt. 3. This is

due to the recognition that the "drawer is in the best position to avoid the fraud and thus should take the loss." Md.Code, Com. Law Art. § 3–404 cmt. 3. We found no evidence in the record of this case to suggest the application of this default rule would be inappropriate. Of either party involved here, American General had the best means available by which to protect itself against the fraud, the least of which included contacting the personal references the imposter listed on the credit application, which may have helped protect American General against the fraud. We reject American General's attempt to shift the burden of the loss here to State Security on so tenuous a basis as State Security's failure to ask the imposter for his thumbprint before cashing the check, where State Security examined the same driver's license and the loan documents American General created and found satisfactory in issuing the check. *See supra* notes 14 and 18.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE DISTRICT COURT AND REMAND THE CASE TO THE DISTRICT COURT WITH DI-RECTIONS TO ENTER JUDGMENT IN FAVOR OF AP-PELLANT; COSTS TO BE PAID BY APPELLEE.**