35 A.3d 464

David CLICKNER, et ux.

v.

MAGOTHY RIVER ASSOCIATION, INC., et al.

No. 13, Sept. Term, 2011.

Court of Appeals of Maryland.

Jan. 20, 2012.

254

Barbara J. Palmer and Eileen E. Powers (Blumenthal, Delavan & Williams, P.A., Annapolis, MD), on brief, for appellants.

Ann M. Fligsten, Arnold, MD, for appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, JOSEPH F. MURPHY, JR.* (Retired, specially assigned), JJ.

---

\* Murphy, J., participated in the hearing and in the conference of this case in regard to its decision after being recalled pursuant to the

GREENE, J.

Six individuals and the Magothy River Association, Inc. (collectively, "Association" or "Appellees") brought suit against the recent purchasers of Dobbins Island, David and Diana Clickner ("Clickners" or "Appellants"), seeking to establish a public right to use a beach located alongside the island's northern crescent area. Following a bench trial on the merits, the trial judge determined that Appellees had demonstrated the existence of a prescriptive easement on behalf of the public and ordered the removal of portions of a fence erected on the beach by Appellants. In making this determination the trial judge applied the general presumption of adverse use and accordingly placed the burden on Appellants to prove that the use was, in fact, permissive. Based on the record before us, however, we determine that this application was in error, as the beach at issue was unimproved and otherwise in a general state of nature; therefore, the proper presumption, under the circumstances, was that public use was by permission of the owner. Thus, the trial court's judgment and its order directing Appellants to remove portions of the fence erected on the beach were in error and we shall reverse.

## FACTS AND PROCEDURAL HISTORY

Appellants own Dobbins Island ("the island"), a seven-acre parcel of land surrounded by the Magothy River. The island has a long, albeit mysterious, presence in Maryland history. According to sales literature, it was first surveyed in 1769 as twelve acres and granted by patent to William Gambrel. In the 1850's it was conveyed to George Dobbin, and held in a family trust, until it was conveyed to Dutchship Island, LLC. Appellants purchased the island in 2003, with plans to build a home on the property. Prior to the purchase, the Clickners received a marketing brochure from Dutchship Island, LLC entitled "Island–Jewel." The brochure included several color

Constitution, Art. IV, Sec. 3A but did not participate in the adoption of this opinion.

photographs of the property and described it as "the perfect blend of tranquility and accessibility—an idyllic, unspoiled natural retreat surrounded by deep pristine waters. . . ." The island's north side, according to the brochure, "forms a gentle crescent ideal for a protected boat anchorage." A photograph of the "idyllic sandy beach" along the crescent was also included, showing only a single boat in the water and no persons or items on the sand.

The brochure also presented a brief history of the island entitled "Dobbins Island–Historic Treasure." The introductory sentence in this historical narrative reads: "[t]his delightful island-jewel, has been a magnet for picnickers and boaters as they enter the mouth of the Magothy River for more than 250 years, serving as a beacon for pleasure boaters, crabbers, fishermen, and duck hunters alike." The page included a photograph of two people sitting on the beach, captioned: "A 1963 picnic on Dobbins Island." The narrative also related legends, which "hover over Dobbin's [sic] Island like transparent kites." A prominent tale in Magothy River lore involves the alleged sinking of a Dutch ship near the island in the 1700's, an accident which left Dutch coins behind for discovery by local residents and gave the property its local moniker, "Dutchship Island."

A letter included in the brochure with the greeting, "Dear Prospective Buyer," invited would-be purchasers to look into the opportunity to build a "dream home ... on the last remaining unbuilt private island on the Western shore of the Chesapeake Bay near Annapolis, Maryland." It characterized the island as a "natural setting" that is "beautifully wooded with mature trees for privacy," with "4,000 feet of shoreline, 1,000 feet of pristine beach, and a home site already approved for ... almost any sized home." The letter, however, like the introductory sentence of the historical narrative, foreshadowed the conflict which has arisen in this case, when it stated: "[f]or more than 300 years, Dobbins has been a magical *place for people to visit and relax.* With a large and expansive *private* white sandy beach, protected deep water access, and incredi-

ble 360 degrees vistas, a more beautiful or perfect place to escape to cannot be imagined." (emphasis added).

While the brochure materials certainly suggest a conflict between the island's public visitation and its private ownership, Mr. Clickner testified that he did not discuss any public use of the property with the sellers and was not aware of the use prior to purchase. Also, although he had spent time on the Magothy River in his youth, Mr. Clickner made clear that he had not visited or inspected the island until he toured it with the seller, and that he had submitted his offer to purchase the property during that initial tour.

After the Clickners purchased the island and became aware of its extensive public use, they posted "No Trespassing" signs along the perimeter and, in May 2006, were granted a building permit from Anne Arundel County to erect a 1,200 foot fence along the shoreline above mean-high tide.[1]  The fence included

---

1.  Just as in *Department of Natural Resources v. Ocean City*, 274 Md. 1, 332 A.2d 630 (1975), the property at issue in the instant case is the dry sand portion of a beach.  Accordingly, James J. Nolan, Jr., Recent Development, Department of Natural Resources v. Mayor and Council of Ocean City, 274 Md. 1, 332 A.2d 630 (1975), 5 U. Balt. L.Rev. 349, 349 & n. 3 (1976) provides a helpful guide to the terminology used throughout this opinion.  The article provides the following definitions:

    (a) The *beach* is the area between the ocean and the upland.  A beach consists of two main areas, the foreshore and the dry sand area.

    (b) The *foreshore* is the strip of land between the low and high water marks which is alternately covered and uncovered by the flow of the tide.  ["Often used synonymously with 'wet sand beach.'" Nat'l Oceanic and Atmospheric Admin., Coastal Services Ctr., *Glossary*, Public Trust Doctrine Course, http://www.csc.noaa.gov/ptd/glossary.htm (last visited Jan. 20, 2011).].

    (c) The *dry sand portion* of the beach consists of the area between the mean high tide line and the vegetation line.

    (d) The *vegetation line* is the extreme seaward boundary of the natural vegetation that spreads continuously inland.  It marks the border between the dry sand beach and the adjoining upland.

          *        *        *

    (f) The *upland* is the area adjacent to the beach.  It extends landward from the vegetation line, dune line, or other natural boundary of the dry sand beach.

    (g) The *mean high tide line* represents the average height of high tidal water on the shore over a considerable period of time.  [*Borax*

13 pilings placed along the beach and strung together with cable. There is some discrepancy in the record as to the exact location of the fence, as there was testimony that it was installed at approximately six inches to two-feet above mean high water.

On July 10, 2008, in reaction to the fence installation, Appellees filed a two-count complaint in the Circuit Court for Anne Arundel County seeking "to establish their rights to continue to use the island as they have used it in the past," on behalf of themselves and the general public.[2] The second count sought to have the fence removed or relocated "because the fence does not properly mark the mean high water line." An amended complaint was filed on November 13, 2008 adding two new parties as well as assertions of an easement by implied dedication and public custom.

During the trial, Appellees put forth the testimony of the six individually named plaintiffs, the president of the Magothy River Association, and an expert in the use of tidal data as it relates to coastal boundary disputes. Appellees also called and questioned Mr. Clickner about the circumstances surrounding his purchase and the decision to erect a fence on the beach. Appellees presented evidence to establish the long, historical use of the island beach. They entered photographs that were apparently taken in the 1920's or 30's depicting persons canoeing around the island and also photographs of public use of the shore during the 1970's and 1980's.

_Consol., Ltd. v. Los Angeles_, 296 U.S. 10, 26–27, 56 S.Ct. 23, 31, 80 L.Ed. 9, 20 (1935) (noting that according to the United States Coast and Geodetic Survey, mean high tide is calculated by averaging the high tides over an 18.6 year period); Nat'l Oceanic and Atmospheric Admin., Coastal Services Ctr., _supra_ ("The mean average of all the high tides (high high tides and low high tides) occurring over a certain period of time, usually 18.6 years (one lunar epoch).")].

\*       \*       \*

(i) _Littoral_ means belonging to the shore, as of seas and great lakes. (Internal citations omitted.).

**2.** The Appellees had filed an earlier, similar action in December of 2006, and dismissed it without prejudice in April of 2007.

Appellees also presented Chesapeake Bay Magazine's "Best of the Bay Survey" from 2006 which included Dobbins Island as one of the best anchorage sites in the Chesapeake Bay. Mr. Paul Spadaro, president of the Magothy River Association, testified that this anchorage spot at Dobbins Island is used as the official site for the Association's "Magothy River Day." This event celebrates the history of the river, and includes a "wade-in" on the sandbar in which participants wear white shoes and wade into the water until they can no longer see their feet, in order to test the river's visibility and water quality. In 2007, approximately 200 boats attended the inaugural event, and in 2008, over 400 boats were present. While Mr. Spadaro testified that his organization stressed that participants respect the island as private property, several photographs introduced by Appellants show several people using the beach area beyond the Clickners' fence.

Each individually named plaintiff recounted his or her lifelong affinity for and interaction with the beach, each using it from long memory for recreational purposes, such as picnicking, mooring, sunbathing, and swimming. While many witnesses explained their historic use of the entire island, counsel clarified that Appellees were asserting a claim only to the dry sand portion of the beach. Several witnesses also described the extensive public use of the area during summer months, estimating that approximately 75 to 100 persons would be on or around the beach on a given day. The testimony also made clear that the Dobbins Island was, and has always been uninhabited and undeveloped.

There was consistency amongst the witnesses' answers to questions aimed at eliciting whether use of the island was adverse or by permission of the owner. The testimony revealed that the witnesses were never given individual permission to use Dobbins Island and that they did not necessarily know who owned the island.[3] Further, the witnesses did not

---

3. Several witnesses testified that while they knew the island was private property, they did not know who owned the island, although some suspected it was the Dobbin family. Others, like as Mrs. Carol Auer,

think of themselves as trespassers but instead assumed the land was open for public use because it was common practice for members of the public to use the island for recreation and they did not see "no trespassing" signs on the property. In other words, they felt privileged to use the beach "because everyone else did." The following testimony is illustrative of the testimony given by Appellees. Ms. Carol Auer, age 55, explained that she remembered using the beach with her family from the age of seven. She continued to use the island for recreation throughout her lifetime and testified that "it was a very popular place to go if you had a boat." In response to questions on direct examination, she revealed:

Q. Did anyone ever give you permission to use the island?

A. No.

Q. And what was your understanding about the ownership of the island, if you had an understanding.

A. I didn't know who owned the island. Until Mr. Clickner bought it I didn't really know who owned the island.

In response to questions on cross-examination, she stated:

Q. So you generally understood that it was private property?

A. I understand it now. When I was a kid, no. I didn't know who owned it.

Q. Not as a kid but as an adult. I mean certainly you know it's not state park land, right?

A. I didn't know what it was. I really had no idea. I didn't know if it was state-owned. I actually thought at one point it might be. I had no idea.

Q. So you didn't bother to look into it.

A. No.

Q. Okay. You just would go out there and use the property?

A. That's right.

whose testimony is recounted herein, did not know whether the island was publicly or privately owned.

Q. And you felt like your use was generally permitted by the owner, didn't you?

A. Yeah, I guess so. I mean I never thought about it. I never thought about who owned it because it was something I had done and had been done and had been publicly used forever. For as long as I remember.

\* \* \*

Q. And no one has identified themselves as an owner of the property and asked you to modify your behavior, right?

A. No. No one ever has.

Q. Okay. But you generally felt that you were invited to the island by whomever owned it.

A. No. I wouldn't say that. I never thought that way. I never felt that I had a personal invitation or that it was like—it was like I didn't—I never felt that way that I was invited. I thought—

Q. Okay. You felt like you were—

A. —I thought it was a proper thing to do. I didn't think it was improper to use the island.

Q. Okay. So you are going to stick with the generally accepted as a permitted thing to do regardless of who owned it?

A. Yeah, I think that that's fair.

Q. Well, do you see any use, any difference in your use of the island and a trespasser of the island?

\* \* \*

A. Let's see. I think when I use the word trespasser I would assume that the person who is trespassing is doing it and they know they are doing something wrong. If that's the term, if that's the way you are defining trespasser, no I don't think I thought of myself as a trespasser on the island.

In addition to testimony, there was also documentary evidence offered in an attempt to establish whether use of the island's beach was adverse to or by permission of the owner. Appellees introduced an excerpt from Chesapeake Bay Magazine's 1997 "Guide to Cruising [the] Chesapeake Bay" that

described the island and, like the promotional materials given to Mr. Clickner, foreshadowed the issue that has arisen in this case:

> The island is *very popular on summer weekends* and can be a beehive of water-skiing activity. It attracts dozens of boaters, from locals in little runabouts who pull their vessels right up on its sandy beach to large sailboats and cabin cruisers that anchor out.
>
> Many times we have visited Dobbins, once climbing the steep trail to the wooded crest of the island and exploring its mysteries. *But, aware that this was (and is) private land,* we mostly anchored offshore, content to enjoy the beauty of its dark banks which formed a peaceful backdrop for the other boats which swung at anchor there. *Boaters have used Dobbins Island for so long they think it falls in the realm of public property. It doesn't.* This uninhabited island is owned by the heirs of George W. Dobbins [sic], a Baltimore judge who bought it around 1840 for duck hunting. Along with nearby Little Island, it became a summer retreat for family and friends. The original family trust, made in 1908, does not permit the island to be sold. *"No Trespassing" signs have been posted from time to time, but trespassers defiantly use them for building fires on the beach. Occasionally the caretaker on the mainland will motor over to Dobbins and ask people on the beach to respect the island as private property.* (Emphasis added.).

Despite the contents of this excerpt, no witness admitted to seeing either a caretaker approach the beach, or "no trespassing" signs on the island prior to the signage put up by Mr. Clickner. Appellants introduced into evidence a Washington Post article about the controversy, published on July 18, 2006, entitled "Putting the Theory of 'Good Fences' to the Beach Test," in which Mr. Spadaro was quoted as saying "[t]he Dobbins [sic] family was said to have allowed public use of the cove, and subsequent owners upheld that tradition." Mr. Spadaro emphasized in his testimony that while he made this statement, he had never met the Dobbin family. Appellants also introduced a book entitled "Over the Side," written by

Alan and Jessica Bond, which includes an acknowledgment on the inside cover thanking "Dobbins Island's owner for generously allowing public use of the island."

At the conclusion of the hearing, the trial judge asked for written closing arguments from each party and held the matter *sub curia.* In its closing argument, the Association alleged that an easement existed as a result of implied dedication, custom, prescription, and an expansion of the public trust doctrine. The trial judge issued a Memorandum Opinion and Order dated May 7, 2010. The judge held that the public had not gained an easement through either implied dedication, custom, or public trust, but ultimately that the public had, in fact, met the requirements necessary to establish a prescriptive easement.[4] As to the adversity requirement, the court applied the general presumption of adverse use, and held that the Clickners had failed to meet their corresponding burden to prove that public use of the area was by permission. The trial court stated:

> Adverse use means use without license or permission. Additionally, showing a use by the public for twenty years generates a presumption that the use is adverse and of a legal origin. To rebut this presumption, a defendant must prove by affirmative evidence that the claimant's use was by permission or by license. In the instant case, Plaintiff's evidence, consisting of witness testimony and the photographs, convinces the Court that the beach on Dobbins Island has been used since 1963 and as early as the 1920's, well over the statutory twenty years, by the public for the purposes of swimming, sunbathing, walking, picnicking, kayaking, boating, and as an anchorage. Some of the testimony showed that members of the public believed they could use the island but Defendant did not provide affirmative evidence that prior landowners gave permission or license to

---

4. As discussed, *infra,* in order to establish a prescriptive easement in Maryland a claimant must show an adverse, exclusive, and uninterrupted use of another's real property for twenty years. *Banks v. Pusey,* 393 Md. 688, 699, 904 A.2d 448, 454 (2006).

the public to use the beach. Defendant did not overcome this presumption by any showing that the prior landowners granted permission to the public to use the beach. (Footnote and internal quotations omitted.).

In order to allow for use of the newly recognized public easement, the trial court also ordered that the cables between the pilings creating the shoreline fence be removed.

The Court also held that the location of the fence above mean high water could not be challenged because the location was approved by Anne Arundel County, and this approval was not appealed to the appropriate administrative body. Thus, the trial judge explained that the court would not consider the Association's assertion that the pilings were incorrectly placed because the Association had failed to exhaust its administrative remedies.[5] Accordingly, the Circuit Court issued an order, stating:

> **ORDERED,** that the public has an easement by prescription to use the beach on Dobbins Island, from the mean high watermark to the vegetation line, to swim, sunbathe, walk, picnic, kayak, boat, and anchor; and it is further
>
> **ORDERED,** that Defendants are to remove the rope, chain, or cable lines on the park style fencing that interferes with the public easement...."

The Clickners noted their appeal from this decision to the Court of Special Appeals on June 4, 2010. Prior to any proceedings in the intermediate appellate court, we issued a writ of certiorari, on our initiative. *Clickner v. Magothy River Ass'n, Inc.,* 419 Md. 646, 20 A.3d 115 (2011). We now address the following questions, restated for clarity:

1. Did the trial court err in declaring that the public has a prescriptive easement to use the beach on Dobbins Island?

2. Did the trial court err in ordering the removal of a portion of the fence placed on the Dobbins Island beach?

---

5. The propriety of this ruling is not before us, and we do not address it.

We shall answer both questions in the affirmative and therefore reverse the judgment of the trial court.

## I.

The case at issue was heard at a bench trial. Pursuant to Maryland Rule 8–131(c), we shall apply the clearly erroneous standard of review to factual findings and review the decision for legal error.

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Md. Rule 8–131(c). Accordingly, we give due regard to the trial court's role as fact-finder and will not set aside factual findings unless they are clearly erroneous. *State Security v. American General,* 409 Md. 81, 110–111, 972 A.2d 882, 899 (2009); *Banks v. Pusey,* 393 Md. 688, 697, 904 A.2d 448, 453 (2006); *$3,417.46 U.S. Money v. Kinnamon,* 326 Md. 141, 149, 604 A.2d 64, 67–68 (1992). "The appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed." *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834, 835–36 (1975) (citations omitted); *$3,417.46 U.S. Money,* 326 Md. at 149, 604 A.2d at 67. Questions of law, however, require our non-deferential review. *State Security,* 409 Md. at 111, 972 A.2d at 899; *Banks,* 393 Md. at 697, 904 A.2d at 453–54. When the trial court's decision "involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct. . . ." *White v. Pines Community Improvement Ass'n, Inc.,* 403 Md. 13, 31, 939 A.2d 165, 175 (2008) (quoting *YIVO Inst. for Jewish Research v. Zaleski,* 386 Md. 654, 662, 874 A.2d 411, 415–16 (2005)). Where a case involves both issues of fact and ques-

tions of law, this Court will apply the appropriate standard to each issue. *Dickerson v. Longoria,* 414 Md. 419, 432, 995 A.2d 721, 730 (2010); *see Diallo v. State,* 413 Md. 678, 695, 994 A.2d 820, 830 (2010).

The issues presented in the instant case are legal questions as they involve the interpretation of Maryland case law regarding prescriptive easements and the application of that law to the facts. Therefore, we review the trial court's judgment to determine whether there was legal error.

## II.

Both parties recognize that the State of Maryland owns in public trust, for the benefit of its citizens, the navigable water [6] of the Magothy River surrounding Dobbins Island and the subject beach up to the mean high water line. *See* Md.Code (1974, 1984 Repl. Vol.), § 16–101(*o* ) of the Environment Article ("'State wetlands' means any land under the navigable waters of the State below the mean high tide, affected by the regular rise and fall of the tide."); *Anne Arundel County v. City of Annapolis,* 352 Md. 117, 132–33, 721 A.2d 217, 224 (1998) ("The navigable waterways within Maryland's boundaries and the lands beneath them generally are 'held' by the State for the benefit of the inhabitants of Maryland." (citations omitted)); *Hirsch v. Md. Dep't. of Nat. Resources,* 288 Md. 95, 98–99, 416 A.2d 10, 12 (1980); *Dep't of Natural Res. v. Ocean City,* 274 Md. 1, 5, 332 A.2d 630, 633 (1975); 2 Herbert T. Tiffany, *The Law of Real Property* § 660 at 698–99 (3d ed. 1939) ("Land bordering on the sea ... or on a tidal river, and lying above ordinary low watermark, but below ordinary high watermark, is known as the [fore]shore, and this, like the land beyond low watermark, belongs prima facie to the state ... the theory being that it is land not capable of ordinary cultivation or occupation, and so is in the nature of unappropriated soil."). Therefore, the mean high

---

6. "Navigable water" has been defined by this Court as "water where the tide ebbs and flows." *Dep't of Natural Res. v. Ocean City,* 274 Md. 1, 6, 332 A.2d 630, 633 (1975).

water line marks the division between state and private ownership of the shoreline. Appellants admit that "a significant part of the historic public use of Dobbins Island is protected by the public trust doctrine. The public is guaranteed the right to anchor in the cove, swim in the waters, pull kayaks, canoes and other small boats onto the shore, and sit on the sandy beach that lies below mean high tide." Appellants also assert that "[p]hotographs taken after the Clickners installed a fence above mean high tide make abundantly clear that [a] large area of sandy beach remains open to public use." Appellees disagree, however, and note that by definition, when the tide is high, the water of the Magothy extends to the Clickners' pilings, leaving little or no visible sand below the fence and thereby precluding public use of the beach on Dobbins Island.

█ Accordingly, Appellees assert a right to use the area above mean high tide, the dry sand portion of the beach, currently fenced off by the Clickners. This area is not subsumed by the public trust doctrine, and has been privately owned since the original grant of the property. Thus, in order for the public to have a right to use and enjoy this portion of the beach, Appellees must demonstrate a property right in the form of an easement, a non-possessory interest in the real property of another that can arise either by express grant or implication. *Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630, 635 (1984) (defining the term "easement"); *see Dep't of Natural Res. v. Ocean City*, 274 Md. 1, 5–6, 332 A.2d 630, 633–34 (1975) (stating that the public trust doctrine "protects the public in the use of the foreshore only . . ." and that a public right to use the dry sand portion of the beach, therefore, "must find support elsewhere," before considering various types of easements); 9 Richard R. Powell, *Powell on Real Property*, § 65.11[3] at 190 (Michael Allan Wolf ed., 2011) ("The general rule appears to be that the public right of access pertains only to the area below the mean high watermark or seaward of the 'dry sand,' unless the public has acquired the right of access across the private land."). The Association alleged in the trial court that a public easement was impliedly

created under the theories of prescription, dedication, custom, and public trust. From these theories, the trial court held that the Appellees had only established an easement by prescription, a conclusion which Appellants challenge before this Court.

The parties dispute at the outset whether Maryland law allows for a public easement to be established on a beach located along an inland waterway.[7] Appellants, relying on *Thomas v. Ford,* 63 Md. 346 (1885), argue that "[the public] may not acquire prescriptive rights in the land of another located along a navigable river." This early case involved an action for trespass, wherein the plaintiff alleged that the defendant had deprived him of his right to use and enjoy his property located along the shore of the Patuxent River by encumbering the land with a large quantity of wood. *Thomas,* 63 Md. at 349. The defendant argued that he had not trespassed because the public had acquired a prescriptive easement over the land, as the property had been used for many years by the general population for shipping wood and other freight, a use that was known, but not objected to by the owner. *Thomas,* 63 Md. at 351. The *Thomas* Court explained:

> It is certainly a settled doctrine in this State that public roads or ways of any kind can only be established by public authority, or by dedication, or by long user by the public, which, though not strictly prescription, yet bears so close an analogy to it that it is not inappropriate to apply to the right thus acquired the term prescriptive. Hence the existence of a public way may be established by evidence of an uninterrupted user by the public for twenty years; the presumption being that such long continued use and enjoyment by

---

7. This issue has been the subject of litigation in other jurisdictions, as reflected in Jon W. Bruce and James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 5:27 at 93 & n. 1 (2011) (hereinafter *Law of Easements* ) ("A current controversy involves claimed public prescriptive easements to use privately owned beaches or lakefronts for recreational purposes.").

the public of such way had a legal rather than an illegal origin.

*Thomas,* 63 Md. at 352 (citing *Day v. Allender,* 22 Md. 511 (1865)). The Court then identified the question presented as: "[W]hether, at the common law, this principle of presumptive dedication, or *quasi* prescription,[8] does or can properly apply to give rise to a right in the general public to use the land of another on a navigable river as a landing-place and place of deposit of wood and other articles of property for an indefinite time." *Thomas,* 63 Md. at 352 (emphasis in original).

---

8. The *Thomas* Court's use of the term *"quasi* prescription" reflects its adherence to the "lost grant" theory of prescriptive easements, prominent at the time of the decision, which relied on a legal fiction that an actual grant was conferred on the claimant but was somehow "lost." Under this theory, the "public" was not able to gain prescriptive rights as it was deemed too amorphous a grantee to feasibly receive a deed. *See Law of Easements* § 5:25 at 86 ("It is conceptually difficult to justify the acquisition of prescriptive easements by the general public under ... the lost grant theory.... The lost grant theory presupposes a definite grantee, and courts have long held that the public is too large and uncertain a group to receive a grant."). The *Thomas* Court implicitly recognized the doctrine when it relied upon the New York case of *Pearsall v. Post,* 20 Wend. 111 (N.Y.Sup.Ct.1838), *aff'd,* 22 Wend. 425 (N.Y.1839) and explained that the use presented in that case "could not be urged by the public ... as the foundation of a legal *presumption of a grant,* and thus justify a claim by prescription...." *Thomas,* 63 Md. at 353 (emphasis added). The "lost grant" theory no longer guides our consideration of prescriptive easements, and is therefore no longer a bar to the acquisition of public prescriptive rights, as such. *See Dep't of Natural Res. v. Ocean City,* 274 Md. 1, 9, 332 A.2d 630, 635 (1975); *Garrett v. Gray,* 258 Md. 363, 376–77, 266 A.2d 21, 27 (1970) (noting with approval, after quoting from *Thomas v. Ford,* a law review article "wherein the author notes that the tendency in modern decisions is to disregard the fiction of the lost grant and to develop a more positive, simpler and direct approach by analogizing adverse user with the application of the [s]tatute of [l]imitations" (citation omitted)); *Law of Easements* § 5:25 at 87 ("[T]he trend of modern cases is to recognize that the public may acquire prescriptive easements."); James J. Nolan, Jr., Recent Development, Department of Natural Resources v. Mayor and Council of Ocean City, 274 Md. 1, 332 A.2d 630 (1975), 5 U. Balt. L.Rev. 349, 368 n. 126 (1976) ("Some courts ... have doubted that the public can acquire an easement by prescription, because the general public, as such, cannot be the beneficiary of the fictional "lost grant." But this obsolete theoretical impediment has not prevented a majority of jurisdictions from allowing the public acquisition of ease-

The *Thomas* Court provided two rationales for its holding
that no prescriptive easement had been established under its
facts. Each party in the instant case touts one of the ratio-
nales as being the *sine qua non* of the *Thomas* Court's
position. The first, relied on by Appellees as a factual distinc-
tion, is that this Court in *Thomas* emphasized that the nature
of the use at issue functioned more like an acquisition of title
than a public prescriptive right. By contrast, Appellees argue
that the public's recreational pursuits on Dobbins Island were
more transient in nature, and therefore are not uses controlled
by the following rationale, as stated by the *Thomas* Court:

> Indeed, the very nature of the user set up in this case as
> evidence of the prescriptive right in, or dedication to, the
> public renders it quite out of the question that such right
> could, upon principle, exist in the public generally. From
> the very nature of the user relied on it must be confined to
> but [a] few individuals, and this negatives the idea of the
> existence of the right in the general public. Instead of the
> right being of a mere easement or servitude, without profit
> in the soil, and open to the enjoyment of all alike, it would
> be an exclusive appropriation of the actual use of the soil to
> the first occupier or depositor of wood or other articles,
> without limit as to the extent or duration of time. The
> claim here set up is the right in the general public to deposit
> and cord wood upon the plaintiff's land [ac]quired by user
> merely. This, of course, must be confined to a defined or
> limited space. If the right were established, each individual
> member of the public could not enjoy it, for the first
> occupier would have the right to appropriate the entire
> space to himself, and no one could question his right in so
> doing. While he remained in possession all the rest of the
> public would be excluded; and there would be no mode of
> determining the question as to the extent of the ground that
> might be appropriated, or the duration of time that it could
> be occupied. It might, indeed, be so occupied for an indefi-

ments by prescription. Maryland counts itself among that majority."
(internal citations omitted)).

nite duration of time. And as was said by the court in the case of *Cortel[you] v. Van Brun[d]t, supra,* [2 Johns. 357 (N.Y.Sup.Ct.1807) ] *such* user rather denotes title, and the right of exclusive enjoyment, than the *enjoyment of a mere public easement;* and the right to *such user* by the public cannot be acquired by prescription.

*Thomas,* 63 Md. at 353–54 (second emphasis added).[9] Indeed, because the Court contrasted exclusive appropriation, which could not give rise to public prescriptive rights, with the "enjoyment of a mere public easement," it suggested that the latter could exist under appropriate circumstances.

The second rationale explained in *Thomas,* and relied on by the Clickners in the instant case, is the Court's following admonition:

[C]onsidering the great extent of shore lines within our State, and the long and uniform indulgence extended by the proprietors of those shores to those who have had occasion to use them for purposes connected with water transportation or fishing, a decision which should admit the possibility of turning such permissive enjoyment into [a] prescriptive and absolute right on the part of the public would open a field of litigation which no community could endure. And what is still worse in a moral point of view, it would be perverting neighborhood forbearance and kind indulgence to the destruction of important rights. Consequently, if it

9. The two cases discussed within the *Thomas* opinion, both support the proposition that the exclusive appropriation of a landing is inconsistent with the existence of a public easement. In *Post v. Pearsall,* 22 Wend. 425 (N.Y.1839), New York's highest court of contemporary record held that the public had no right to use private property adjoining navigable water as a public landing and *place of deposit.* Also, in *Cortelyou v. Van Brundt,* 2 Johns. 357 (N.Y.Sup.Ct.1807), the defendant in a trespass action argued that because he had the right to fish in the navigable waters, he could erect a hut on the shore to accommodate fishermen during the fishing season. The plaintiff argued that "[t]he right of erecting a hut, being an exclusive appropriation, can only be established by grant," and the court agreed, ruling: "[P]rescription [will not] in any case, give a right to erect a building on another's land. This is a mark of title and of exclusive enjoyment, and it cannot be acquired by prescription." *Cortelyou,* 2 Johns. at 361–62.

be once understood that this permissive indulgence of the proprietors of the shores may be construed into irrevocable privileges, restrictions and hindrances will inevitably follow, to avoid the possibility of such permissive use maturing into public adverse rights. The production of any such consequence surely ought not to be desired by anyone.

*Thomas,* 63 Md. at 354–55 (citation omitted). Appellants assert that this language represents a public policy bar to prescriptive easements along the shores of Maryland's inland waterways. This admonition in *Thomas,* however, rather than being a bar to prescription, merely reflects our jurisprudence that mere "permissive indulgences" cannot ripen into adverse rights, *Cox v. Forrest,* 60 Md. 74, 79–80 (1883), and suggests a rationale behind the presumption of permission that, as discussed *infra,* often attaches to the use of land that is unimproved or "in a general state of nature." *Wilson v. Waters,* 192 Md. 221, 228, 64 A.2d 135, 138 (1949).

This understanding of *Thomas* is informed by our decision in *Department of Natural Resources v. Ocean City,* 274 Md. 1, 332 A.2d 630 (1975), in which we noted that a prescriptive easement could be acquired by the public on privately held littoral property above mean high tide under appropriate circumstances. The opinion began: "This case raises for the first time the extent of the rights which neighboring owners and members of the public may respectively have in the littoral at Ocean City, Maryland—that land portion of the beach which lies west of the Atlantic Ocean's mean high tide line. . . ." As we stated, the issue of public beach access was precipitated in the 1970's "as a result of an expanding population and a limited amount of shore line." *Ocean City,* 274 Md. at 6, 332 A.2d at 634. The case presented an action to enjoin the construction of a condominium complex on an ocean front tract, with opponents of construction including the Maryland Department of Natural Resources as an intervening plaintiff. The plaintiffs argued that the public had acquired an easement over the dry sand portion of the beach, advancing various theories. In considering their claim of public prescriptive rights to the area, it was clear to the Court that the tract had

been in use for less than twenty years following a storm that had changed its topography, and therefore any such use as there may have been after the storm failed to meet the requisite prescriptive period. *Ocean City*, 274 Md. at 7–9, 332 A.2d at 634–35. The Court stated, however, that "the law would support the petitioners [in gaining a prescriptive easement] if the necessary facts were available." *Ocean City*, 274 Md. at 9, 332 A.2d at 635 (citation omitted). For our purposes it is paramount to note that in its discussion of public prescriptive rights, the Court in *Ocean City* explicitly acknowledged the *Thomas* decision, quoted its description of the doctrine allowing for public prescriptive rights on roadways, and extended it to dry sand littoral property. *Ocean City*, 274 Md. at 9, 332 A.2d at 635. That case therefore represents Maryland's common law approach to the controversy presented in several states regarding public prescriptive rights for recreation on privately owned, dry sand portions of beaches.[10]

Appellants rely on Judge Eldridge's dissent in *Ocean City* to fashion a distinction between inland and ocean beaches. This distinction allows Appellants to argue that *Thomas v. Ford* is still viable precedent which, under Appellants' interpretation, forbids public prescriptive rights on inland beaches despite the majority's holding in *Ocean City*. Judge Eldridge's dissent in *Ocean City* focused, however, not on prescriptive

---

**10.** Several other states have held, based on the historical reticence to recognize prescriptive rights in the public, that the public cannot obtain prescriptive rights for recreation on beaches. *Law of Easements* § 5:27 at 94; *see e.g., State ex rel. Haman v. Fox*, 100 Idaho 140, 594 P.2d 1093, 1098–99 (1979) (referencing lost grant theory and holding that the public could not obtain prescriptive easement on lakefront beach property absent statutory authority); *Ivons–Nispel, Inc. v. Lowe*, 347 Mass. 760, 200 N.E.2d 282, 283 (1964) ("We are of [the] opinion that 'persons of the local community' and the 'general public' are too broad a group to acquire by prescription an easement to use private beaches for bathing and for recreational purposes."). Maryland, however, following the trend of modern cases, has recognized that the public may acquire such prescriptive rights. *Law of Easements* § 5:27 at 94–95 ("Still, some modern courts have either found prescriptive public rights to use beaches or are willing to recognize the possibility that such rights could be established." (citing *inter alia, Ocean City*, 274 Md. 1, 332 A.2d 630)).

rights, but on the majority's denial of an easement by implied dedication.

While the majority, in *Ocean City*, concluded that a clear and unequivocal manifestation of an intent to dedicate was required in order for the Court to find an easement by implied dedication, Judge Eldridge suggested that "there are few hard and fast rules with respect to implied dedication under Maryland law, and each situation must be viewed in light of its own peculiar circumstances." *Ocean City*, 274 Md. at 19, 332 A.2d at 641 (Eldridge, J., dissenting). Judge Eldridge urged that "a landowner's intent to dedicate his land to public use may be presumed from acts or conduct which estop him from denying the public's right." *Ocean City*, 274 Md. at 16, 332 A.2d at 639 (Eldridge, J., dissenting) (citing *McCormick v. Baltimore*, 45 Md. 512, 523 (1877)). Further, he expounded:

> Because the Atlantic Ocean beach is a unique geographic phenomenon, because it is such a limited resource of the State of Maryland, and because the public involvement in it has been of a different character than that associated with other types of land, the result I would reach in this case is not at all inconsistent with prior Maryland law involving the issue of *implied dedication* of the shore.

*Ocean City*, 274 Md. at 22, 332 A.2d at 642 (Eldridge, J., dissenting) (emphasis added). Judge Eldridge then discussed *Thomas v. Ford*, noting his agreement with the *Thomas* Court's holding that "merely permitting the public to use the shore for boating, swimming or fishing should not in itself give rise to an easement." *Ocean City*, 274 Md. at 22–23, 332 A.2d at 643 (Eldridge, J., dissenting). He then continued to compare inland beaches and ocean beaches saying:

> However, as pointed out above, the ocean beach presents an entirely different matter. While Maryland's inland tidal shoreline measures over three thousand miles, its ocean shoreline is only thirty-five miles long. To recapitulate, from the time of the Charter of Maryland on, the ocean beach has had a unique status. Not only have the landowners acquiesced in the public's use of the beach, but they

have accepted government services, protections and regulations with respect to the beach which are of a totally different character than the government services, protections and regulations provided for other types of privately owned land. Plats have consistently shown an area to be dedicated as "beach." The public and property owners of the State well understand that use of other types of land for recreational activities does not effect a *dedication* to the public. This is in stark contrast to the common understanding that the beach at Ocean City is a public beach.

*Ocean City*, 274 Md. at 23–24, 332 A.2d at 643 (Eldridge, J., dissenting) (emphasis added). Based on the factors emphasized, it is evident that Judge Eldridge was comparing ocean and inland beaches solely in the context of implied dedication, rather than prescription. Indeed, he concluded by stating that the facts presented "compel[ed] the conclusion that the dry sand beach at the front of respondent landowner's lots [was] *dedicated* to recreational use by the general public." *Ocean City*, 274 Md. at 24, 332 A.2d at 643 (Eldridge, J., dissenting) (emphasis added). It is clear, therefore, that Judge Eldridge's dissent makes no reference to, and does not bolster Appellants' argument that *Thomas v. Ford* proscribes prescriptive rights along inland shores.

Appellants, in the instant case, assert that the trial court relied almost exclusively on *Ocean City*, while "giving *Thomas* short shrift." It is clear to us, however, that the trial judge thoughtfully considered *Thomas v. Ford* and dismissed its relevance based both on factual distinctions with the instant case and in light of *Ocean City*, stating:

[The Clickners] argue that *Thomas* is controlling in this matter. This Court does not agree as the facts in *Thomas* as distinguishable. Thomas addressed the public right to store wood and other articles-in-shipment on the shoreline of another's property for an indefinite period of time, which equates to an exclusive appropriation of actual use by the first occupier. Here, the alleged public use is for swimming, sunbathing, walking, picnicking, kayaking, boating, and anchorage. These are more transient uses, different

from uses that equate to the indefinite appropriation of soil by the first occupier. Additionally, *Department of Natural Resources [v. Ocean City]*, which the Court of Appeals decided in 1974, held that the public did not have a prescriptive easement to use the shoreline because the plaintiffs failed to show that the alleged use existed for longer than a twenty-year period. *See Dep't of Nat. Res. v. Ocean City*, 271 [274] Md. 1 [332 A.2d 630] (1975). If *Thomas* barred the courts from recognizing any public right to the use of a shoreline on a navigable waterway via prescriptive easement, there would have been no need to assess the merits of the prescriptive easement claim.

We agree with this assessment. In sum, rather than being a bar to prescriptive easements along the shores of inland waterways, *Thomas* reflects this Court's jurisprudence that, as a general rule, permissive use of another's land cannot ripen into an adverse right. *Kirby v. Hook*, 347 Md. 380, 393, 701 A.2d 397, 404 (1997); *Cox v. Forrest*, 60 Md. 74, 79–80 (1883). *Thomas* also suggests a rationale underlying the presumption of permissive use that, as discussed *infra*, often attaches to the use of land that is unimproved or "in a general state of nature." *Wilson v. Waters*, 192 Md. 221, 228, 64 A.2d 135, 138 (1949). Even assuming, *arguendo*, that *Thomas* could be construed to have raised a policy bar to public prescriptive easements along the shoreline, that precedent was modified by this Court's decision in *Department of Natural Resources v. Ocean City*. We see no meaningful distinction between ocean and inland beaches sufficient to allow public prescriptive rights to accrue on one type of beach and not the other. To the contrary, just as the ownership of all navigable waterways and their foreshores is governed by the public trust doctrine, the dry sand portions of the attached beaches should be subject to the same principles of prescription without distinction as to the character of the water hitting the sand.

### III.

Because we have held, *supra*, that a prescriptive easement may be acquired by the public along inland shores,

we must now analyze whether the elements have been satisfied in the instant case. "In order to establish an easement by prescription a person must make an adverse, exclusive, and uninterrupted use of another's real property for twenty years." *Banks v. Pusey,* 393 Md. 688, 699, 904 A.2d 448, 454 (2006); *accord, Kirby v. Hook,* 347 Md. 380, 392, 701 A.2d 397, 403 (1997); *Shuggars v. Brake,* 248 Md. 38, 45, 234 A.2d 752, 757 (1967); *Condry v. Laurie,* 184 Md. 317, 321, 41 A.2d 66, 68 (1945); *Cox v. Forrest,* 60 Md. 74, 79 (1883). The elements necessary to establish a prescriptive easement in the public are generally the same, however, as explained *infra,* the element of exclusivity necessarily functions differently in the context of public use. *See Mt. Sinai Nursing Home, Inc. v. Pleasant Manor Corp.,* 254 Md. 1, 5–6, 253 A.2d 915, 917–18 (1969) (noting plaintiffs' argument that "continuous adverse, hostile travel over private land by the public for more than twenty years brings into being a public easement," and responding, "although the law [plaintiffs] . . . cite would support their right to prevail, they lack the facts to do so."); *Ocean City,* 274 Md. at 9, 332 A.2d at 635 (noting that "[a]s was the case in *Mt. Sinai* . . . the law would support the [public] if the necessary facts were available"); *Garrett v. Gray,* 258 Md. 363, 375–78, 266 A.2d 21, 26–28 (1970) (analyzing adversity as an element in a claim for a public easement); *Easter v. Overlea Land Co.,* 129 Md. 627, 632, 99 A. 893, 896 (1917) ("The permissive user of the road by [defendant's] neighbors did not make it a public road, for user by license or permission is not adverse, and in order to establish a public way by prescription the user must be adverse."); *Washington Land Co. v. Potomac Ridge Dev. Corp.,* 137 Md.App. 33, 55–59, 767 A.2d 891, 903–05 (2001) (analyzing the elements of exclusivity and adversity in considering a claimed public utility easement). In asserting prescriptive rights, "[t]he burden of proof is on the claimant of the use to show that it has had the character and is of the duration required by the law." *Dalton v. Real Estate & Improvement Co. of Baltimore City,* 201 Md. 34, 41, 92 A.2d 585, 588 (1952) (citations omitted). Continuous public use of the beach on Dobbins Island for the statutory

period is uncontested in the instant case, however, Appellants contend that the trial judge erred in determining that the use was both adverse and exclusive.[11] We agree with Appellants that the use was not adverse, and we reverse on that basis.

---

**11.** As to exclusivity, this Court made clear in *Cox v. Forrest* that, in the context of prescriptive easements:

> By *exclusive*, the law does not mean that the right of way must be used by one person only, because two or more persons may be entitled to the use of the same way, but simply that the right should not depend for its enjoyment upon a similar right in others, and that the party claiming it exercises it under some claim existing in his favor, independent of all others. It must be *exclusive* as against the right of the community at large.

*Cox*, 60 Md. at 80 (emphasis in original); *accord Wilson*, 192 Md. at 226, 64 A.2d at 137; *Shuggars v. Brake*, 248 Md. 38, 45, 234 A.2d 752, 757 (1967) ("Even though a claimant may not have been the only user, it is sufficient if he used the way under a claim of right independently of others." (citation omitted)). Therefore, a claimant's use of the property may exist along with the owner's and does not negate a prescriptive easement as long as it is not subordinate to or dependent upon the owner's use. *See Lichtenberg v. Sachs*, 200 Md. 145, 154–55, 88 A.2d 450, 454 (1952) (agreeing with the trial court's assessment that plaintiff's use of a road was exclusive even though the defendant owners also used part of the road). An individual's use of property in conjunction with the general public, however, cannot support a *private* prescriptive right, unless the individual proves that his or her use was under an individual claim of right. *Gray v. Shell Realty Corp.*, 219 Md. 531, 534, 150 A.2d 255, 256 (1959) ("[Plaintiffs'] claim is that it was enjoyed in common with others, and this is not enough to establish their private right thereto, appurtenant to their land." (emphasis added)). In the context of a public easement, however, the standard of exclusivity is necessarily different. *See Day v. Allender*, 22 Md. 511, 529 (1865) ("If the proof is of a use common to all others as well as to the party claiming the way, it does not establish a *private* way . . . the facts relied on would have justified the finding of a public way . . . by prescription . . . but not a grant to the appellant *individually*." (emphasis added) (internal citations omitted)).

In the instant case, in considering the element of exclusivity, the trial judge stated:

> Generally, to establish a personal easement by prescription the use must have been exclusive. . . . However, the standard with respect to a public easement requires that "all persons must have an equal right to the use and that it must be in common, upon the same terms, however few the number who avail themselves to it." *Garret[t] v. Gray*, 258 Md. 363, 378 [266 A.2d 21] (1970). Here, there is ample evidence showing the common use of the beach by the public at large.

This Court explained adverse use in the context of prescriptive easements in the early case of *Cox v. Forrest*, 60 Md. 74 (1883), stating:

By *adverse* is meant a *user*, without license or permission, for an adverse right of an easement cannot grow out of a mere permissive enjoyment, the real point of distinction being between a permissive or tolerated user, and one which is claimed as a matter of right. Where one, however, has used a right of way for twenty years unexplained, it is but fair to presume the user is under a claim of right, unless it appears to have been by permission. In other words, the use of a way over the lands of another whenever one sees fit, and without asking leave, is an *adverse* use, and the burden is upon the owner of the land, to show that the use of the

---

We agree with the trial judge's analysis. This Court in *Garrett v. Gray*, 258 Md. 363, 266 A.2d 21 (1970) considered the alleged public acquisition of a road, and although we cited case law establishing the "familiar principle" that establishing prescriptive rights requires proof of "an adverse, exclusive and uninterrupted use" for the statutory period, we did not analyze the exclusivity requirement under the facts. *Garrett*, 258 Md. at 375–78, 266 A.2d at 26–28. We noted only that:

Public use requires that all persons must have an equal right to the use and that it must be in common, upon the same terms, however few the number who avail themselves of it. The law is well settled that a public road is a public highway regardless of the number of people who use it if everyone who desires may lawfully use it, as it is the right of public travel and not the exercise of the right which constitutes a road a public highway.

*Garrett*, 258 Md. at 378, 266 A.2d at 28 (quotation and internal citation omitted). Notwithstanding, we find this statement to be instructive on the subject, as *public* rights to a highway or a beach, by definition, are enjoyed by the public at large. Therefore, the exclusivity requirement discussed by this Court in *Cox v. Forrest* subsequent case law refer to the *personal* acquisition of easements, and the requirement must be interpreted differently in the context of public easements. *See Easter v. Overlea Land Co.*, 129 Md. 627, 632, 99 A. 893, 896 (1917) ("The user relied on to establish the way must also be a user by the public generally, that is by all who have occasion to use the road."). The use need not be exclusive to the individual, but exclusive to the public as a whole in the sense that the public used the property in common under a claim of right, without seeking permission from the owner or otherwise subordinating its use to the owner's will. Indeed, in the instant case, each witness testified that they were claiming a right to use the beach for the general public, not solely on behalf of the Association or themselves as individuals.

way was by license or contract inconsistent with a claim of right.

*Cox*, 60 Md. at 79–80 (emphasis in original) (citations omitted); *Banks v. Pusey*, 393 Md. 688, 701–02 & n. 7, 904 A.2d 448, 455–56 & n. 7 (2006) ("All of Maryland's cases concerning prescriptive easements . . . appear to be the progeny of *Cox* . . . ." (internal citations omitted)). Appellants argue that the public use of the beach on Dobbins Island was permissive and therefore the conclusion that a prescriptive easement existed in this case was in error, as an adverse use cannot develop from a "mere permissive enjoyment."

A use is adverse if it occurs without license or permission. *Kirby*, 347 Md. at 392, 701 A.2d at 403; *Condry*, 184 Md. at 321, 41 A.2d at 68. "As a general rule, permissive use can never ripen into a prescriptive easement." *Kirby*, 347 Md. at 393, 701 A.2d at 404 (citation omitted). As explained in *Cox*, when a person has used a right of way openly, continuously, and without explanation for twenty years, it is presumed that the use has been adverse under a claim of right. *Cox*, 60 Md. at 79–80; *Banks*, 393 Md. at 698–99, 904 A.2d at 454; *Condry*, 184 Md. at 321, 41 A.2d at 68. The burden then shifts to the landowner to prove that the use was, in fact, permissive. *Cox*, 60 Md. at 80. There are circumstances, however, where the presumption is reversed, and the burden falls on the claimant to demonstrate that the use was under a claim of right. *See Banks*, 393 Md. at 712–13, 904 A.2d at 463 ("[W]here an individual resides on his parents' property from the time he or she is a minor, his or her use of the property shall be deemed permissive absent any affirmative evidence of a change in circumstances to adverse use."). In the instant case, as explained *infra*, the public's use of the beach on Dobbins Island was presumptively permissive and the trial judge should properly have placed the burden on the Association to demonstrate that such use was, in fact, adverse.

When an easement is claimed on land that is unimproved or in a general state of nature, there is a legal presumption that the use is by permission of the owner. This

Court first referenced the so-called "woodlands exception" to the general presumption of adverse use in *Day v. Allender*, 22 Md. 511 (1865). Although the Court's focus was on the public dedication of a roadway, we also discussed prescriptive rights and noted a case in which the jury was instructed that "the *mere use* of a *road* over unenclosed *woodland* could not confer a right of way, as a neighborhood road or private path, unless the use was shown to be adverse...." *Day*, 22 Md. at 526 (emphasis in original) (citation omitted). In *Day* we also stated that:

> As the presumption of a right of way arises from the exercise of a privilege adverse to the right of property [ownership] ... a distinction must therefore be observed between a claim of a way through enclosed and cultivated land, and of a way over unenclosed land. In the former case, the mere use is an invasion of property and a trespass; and acquiescence or submission to the exercise of a privilege under circumstances which make it actionable, may justify the inference of a legal right in the person who exercises the privilege.

*Day*, 22 Md. at 526–27 (quotation omitted).

This Court further explicated the doctrine in *Wilson v. Waters*, 192 Md. 221, 64 A.2d 135 (1949). We said:

> It is true that some courts have ruled that the fact that land, over which a right of way is claimed, was "unenclosed" raises a presumption that the use was permissive. By that ruling, however, the courts have occasionally been misled to establish easements over vacant lots in urban districts, although the lots had been cleared and cared for. Thus it seems that the more appropriate term in such cases is "unimproved."

*Wilson*, 192 Md. at 228, 64 A.2d at 138 (citation omitted). We explained in *Wilson* that because the lot in question was only 150 feet deep that the case was "not exactly like those cases in which the land over which the right of way is claimed is wild land, woodland, or other land in a general state of nature." *Wilson*, 192 Md. at 228, 64 A.2d at 138. We recognized,

however, that "[i]n such cases it may be presumed that use of the land is permissive, because it is the custom of neighboring owners to travel over such land for pleasure or convenience, and the owners usually make no objection to their doing so." *Wilson,* 192 Md. at 228, 64 A.2d at 138; *see Feldstein v. Segall,* 198 Md. 285, 295, 81 A.2d 610, 615 (1951) (referencing the presumption of permissive use for unenclosed or unimproved land set out in *Wilson v. Waters* ).

In *Leekley v. Dewing,* 217 Md. 54, 141 A.2d 696 (1958), we recognized the defendant's argument that in accordance with *Wilson* and *Feldstein,* "no presumption that the use was adverse arises when the way is over wild or unoccupied land." *Leekley,* 217 Md. at 59, 141 A.2d at 698. We explained:

This has been said to be because it was the custom of neighbors to travel over such land for pleasure or convenience and the owners usually made no objection to their doing so, or because the use in wild, unoccupied territory would not be apt to be brought to the actual notice of the owner so that he could object.

*Id.* Ultimately, we held, under the facts presented, that the road involved did not fall into the category of "wild or unoccupied territory," as it "ran from a main public road and was clearly and manifestly a regularly traveled way that ran for much of the time to a clearing on which stood an inhabited dwelling which was visible from the main road." *Leekley,* 217 Md. at 59, 141 A.2d at 698–99.

In *Forrester v. Kiler,* 98 Md.App. 481, 633 A.2d 913 (1993), the intermediate appellate court applied the woodlands exception to the use of a right of way through an area it described as "wooded, unenclosed land," that connected two parcels of property. *Forrester,* 98 Md.App. at 487, 633 A.2d at 916; *see Turner v. Bouchard,* 202 Md.App. 428, 32 A.3d 527 (2011) (noting that "[t]he servient estate in *Forrester* was nearly a quarter mile from the nearest county road and consisted of eight acres of ... dense forest in a general state of nature...."). In its analysis, the *Forrester* court aptly noted that:

Many of our sister states have recognized that an exception to the presumption exists when [the] property in controversy consists of unenclosed and unimproved wild lands or woodlands. Thus, when unenclosed and unimproved wildlands or woodlands are involved, the presumption is that the use was permissive, and the burden of proving that the use was adverse or under a claim of right is upon the one asserting these rights.

*Forrester*, 98 Md.App. at 485, 633 A.2d at 915 (citations omitted); *see* 4 Richard R. Powell, *Powell on Real Property*, § 34.10[2][c] at 97–99 & n. 23 (Michael Allan Wolf ed., 2011) (citing numerous cases from other jurisdictions that applied a presumption of permissive use to land which was "open, unenclosed, and unimproved"). The court explained the rationale behind the presumption, stating:

[I]n the case of unenclosed woodlands, permission is presumed because, otherwise, [a]n owner could not allow his neighbor to pass and repass over a trail, upon his open, unenclosed land without danger of having an adverse title successfully set against him. Moreover, [a] landowner who quietly acquiesces in the use of a path, or road, across his uncultivated land, resulting in no injury to him, but in great convenience to his neighbor, ought not to have thereby lost his rights.

*Forrester*, 98 Md.App. at 485, 633 A.2d at 915 (internal quotations omitted). In reaching its holding, the intermediate appellate court noted that the repeated reference to the so-called woodlands exception by the Court of Appeals, signaled its relevance as this Court "would not have discussed the exception so thoroughly if it were not the law." *Forrester*, 98 Md.App. at 485–87, 633 A.2d at 915–16 (noting that *"Wilson* and *Leekley* both recognized that, in determining whether a prescriptive easement exists, permission will be presumed in the case of wooded, unenclosed land.").

In the instant case, we are presented with the question of whether the beach on Dobbins Island is property subject to the woodlands exception. Under this exception, the long

history of public use of the beach would be considered to have been presumptively permissive under the law. Particularly relevant to our inquiry is this Court's decision in *Department of Natural Resources v. Cropper*, 274 Md. 25, 332 A.2d 644 (1975), a companion case to *Department of Natural Resources v. Ocean City*, 274 Md. 1, 332 A.2d 630. Like its companion case, *Department of Natural Resources v. Cropper* also involved a claimed public prescriptive right to the dry sand portion of an Ocean City beach. In that case, we affirmed the trial court's judgment that the evidence failed to demonstrate "a continuous and uninterrupted adverse use by the general public for a period of 20 years," but that it merely established "a miscellaneous and promiscuous use of *land in a general state of nature*." *Dep't of Natural Res. v. Cropper*, 274 Md. at 28, 332 A.2d at 646 (emphasis added) (noting that the trial court cited *Feldstein v. Segall*, *Wilson v. Waters*, and *Thomas v. Ford*, each of which we discussed *supra*, in the instant case, to support its decision).

We consider the *Cropper* case to be instructive in our determination that the beach on Dobbins Island is properly characterized as being "in a general state of nature." *See Cropper*, 274 Md. at 28, 332 A.2d at 646; *Wilson*, 192 Md. at 228, 64 A.2d at 138. We do not hold that this is the applicable characterization of every beach, but that the consideration of other factors, such as the nature of the surrounding area, should enter into the determination. *See Leekley*, 217 Md. at 59, 141 A.2d at 698 ("Some courts have held that the scope of this doctrine does not extend to unenclosed woodland[s] forming part of a plantation or to a road passing near a barn or a residence." (citation omitted)). It is undisputed that the beach at issue is attached to an uninhabited, uncultivated, and undeveloped island. Indeed, the witnesses described the island they frequented with adjectives such as "overgrown," "uninhabited," and "unimproved."

Appellees argue that the woodlands exception should not apply because it is only relevant to interior rights of way that are not easily observable. By contrast, they contend that because the public's beach activities on Dobbins Island are

locally well-known and unhidden, the general presumption of adversity should control. This argument, however, ignores the development of case law in this Court which has focused not only on whether the land use was shielded from view, but whether the land itself was "unimproved," or "in a general state of nature." *Cropper,* 274 Md. at 28, 332 A.2d at 646; *Wilson,* 192 Md. at 228, 64 A.2d at 138.

The visibility of the use is one rationale which guided the common-law development of the woodlands exception. *Leekley,* 217 Md. at 59, 141 A.2d at 698. Another rationale, of particular importance in the instant case, is that owners of unimproved lands ordinarily suffer no deprivation of their rights of use and enjoyment by allowing others access to their property. *See Leekley,* 217 Md. at 59, 141 A.2d at 698 (noting that the exception arose "because it was the custom of neighbors to travel over such land for pleasure or convenience and the owners usually made no objection to their doing so. . . ."); *Forrester,* 98 Md.App. at 485, 633 A.2d at 915 ("[A] landowner who quietly acquiesces in the use of a path, or road, across his uncultivated land, resulting in no injury to him, but in great convenience to his neighbor, ought not to have thereby lost his rights." (quotation omitted)); *Town of Manchester v. Augusta Country Club,* 477 A.2d 1124, 1130 (Me.1984) ("[The exception] is predicated on the notion that [recreational] use by the general public is consistent with, and in no way diminishes, the rights of the owner in his land"); *Spiegle v. Beach Haven,* 116 N.J.Super. 148, 281 A.2d 377, 382 (App.Div.1971) (holding that use of unimproved land in a general state of nature "is presumably permissive if there has been no actual deprivation of any beneficial use to the owner"); *State ex rel. Shorett v. Blue Ridge Club,* 22 Wash.2d 487, 156 P.2d 667, 671 (1945) (noting that the public use of wild, uncultivated land is presumed to be permissive because "it [does] not in any way interfere with the owner's use," and therefore "the owner has no reason for excluding the public from the land"); Daniel A. Degnan, *Public Rights in Ocean Beaches: A Theory of Prescription,* 24 Syracuse L.Rev. 935, 962 (1973) ("Owners of open woodland[s] ... should not be expected to treat most

uses as adverse and it would be unreasonable to require the owner to fence his land or guard against trespassers.... [Also] it would be unfortunate if owners were forced to exclude the public. In the United States with its great land areas ... courts affirm that harmless trespasses should not be discouraged and that it would be unfair to penalize the generous owner." (footnotes omitted)).

As suggested by *Thomas v. Ford* and subsequent case law, the public's recreational use of the dry sand portion of the beach on Dobbins Island is presumed to have been a product of the *permissive* indulgence of its owners. *See Thomas*, 63 Md. at 353–54. To hold otherwise would galvanize owners into fencing or otherwise obstructing their beaches in order to avoid the assertion of public prescriptive rights, feasibly creating a barricade across Maryland's shoreline. In the words of the *Thomas* Court, "such [a] consequence surely ought not to be desired by anyone." [12] *Thomas*, 63 Md. at 355.

---

**12.** By way of illustration, we decline to follow the direction of the Supreme Court of California in *Gion–Deitz v. City of Santa Cruz*, 2 Cal.3d 29, 84 Cal.Rptr. 162, 465 P.2d 50, 57 (1970), where the Court rejected the owner's argument that because his beach was unimproved land, that the public's use of it was presumptively permissive. Instead, the court suggested that it would presume adverse use by the public if the use continued for a five-year prescriptive period, resulting in what that Court deemed "dedication by adverse use." *Gion–Deitz*, 84 Cal. Rptr. 162, 465 P.2d at 56–57 ("For a fee owner to negate a finding of intent to dedicate based on uninterrupted public use ... he must either affirmatively prove that he has granted the public a license to use his property or demonstrate that he has made a bona fide attempt to prevent public use."). While legislative action quickly limited its holding, *see* Cal. Civ.Code § 1009, *Gion–Deitz* spurred land owners throughout California to take affirmative steps to close off their beaches. *See County of Orange v. Chandler–Sherman Corp.*, 54 Cal.App.3d 561, 126 Cal.Rptr. 765, 767 (1976) ("Reaction to *Gion–Deitz* was prompt. In addition to soaring sales of chain link fences, as owners of shoreline property frantically attempted to bar the public from the use of their property, the case generated a spate of law review comment which was generally critical." (footnote omitted)); Michael A. O'Flaherty, Note, *This Land Is My Land: The Doctrine of Implied Dedication and Its Application to California Beaches*, 44 S. Cal. L.Rev. 1092, 1096 (1971) ("After *Gion–Deitz*, the absentee owners of some of the most beautiful parcels put up miles of seven-foot-high fence topped with three strands of barbed wire.").

This conclusion is consistent with the pronouncements in other states regarding the character of the beaches at issue in those cases. *Town of Manchester v. Augusta Country Club,* 477 A.2d 1124, 1130 (Me.1984) (applying a rebuttable presumption of permissive use to a lakefront beach, as "wild and uncultivated land"); *Spiegle v. Beach Haven,* 116 N.J.Super. 148, 281 A.2d 377, 382 (App.Div.1971) (noting that the ocean front beach at issue was land "in a general state of nature and left unimproved by its owner"); *State ex rel. Shorett v. Blue Ridge Club,* 22 Wash.2d 487, 156 P.2d 667, 670–71 (1945) (holding that a beach bordering on Puget Sound, used extensively for public recreation, was "completely wild, open, vacant, unoccupied, and in its natural state" and therefore public use was "presumed to have originated by permission until some act . . . of the public or public official asserted the use to be exercised as a matter of right rather than privilege").

■■■ As noted, *supra,* "[a]s a general rule, permissive use can never ripen into a prescriptive easement." *Kirby,* 347 Md. at 393, 701 A.2d at 404 (citation omitted); *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners,* 380 Md. 106, 123, 843 A.2d 865, 874 (2004). As such, use that is originally permissive "is presumed to continue, and there must be affirmative evidence of [a] change to adverse use." *Feldstein,* 198 Md. at 295, 81 A.2d at 615; *accord Banks,* 393 Md. at 709, 904 A.2d at 460 (noting that "[r]espondent's use of the farm lane was permissive when he was a minor and there was no affirmative evidence that it ever ceased to be permissive. . . ."). The case of *Hungerford v. Hungerford,* 234 Md. 338, 199 A.2d 209 (1964), although addressing adversity in the context of adverse possession, has been considered instructive on the requirement of adverse use in prescriptive easement cases. *See Banks,* 393 Md. at 709–10, 904 A.2d at 461. We said in *Hungerford:*

It has long been held by this Court that where the original entry and subsequent occupancy of land was under a contract, or with the consent or permission of the owner, the possession would not be hostile or adverse and could not evolve into a subsisting title on which recovery could be had,

unless the record owner had notice that the continuing possession was under a claim of right, since it is the intent with which possession is continued that gives it its character as adversary.

*Hungerford,* 234 Md. at 341, 199 A.2d at 211 (citing, *inter alia, Feldstein v. Segall,* 198 Md. 285, 81 A.2d 610 (1951)).

Because the public's use of the privately owned, dry sand portion of the beach on Dobbins Island was presumptively permissive, Appellees had the burden to show that the use was, in fact, adverse from the outset, or that its character became adverse at a point in time sufficient to meet the twenty-year prescriptive requirement. *See State ex. rel Shorett,* 156 P.2d at 670–71 (holding that public use of a beach was "presumed to have originated by permission and to have continued as a license until some act ... of the public or public official asserted the use to be exercised as a matter of right rather than privilege"); *Houghton v. Johnson,* 71 Mass.App. Ct. 825, 887 N.E.2d 1073, 1085 (2008) (holding that various acts on the beachfront were not examples from which it could be presumed that the owner knew that the actors were using the property under a claim of right). It is clear under the facts of this case that Appellees failed to overcome the presumption of permission, as there was insufficient affirmative evidence to demonstrate that use of the beach was ever claimed adversely as a matter of right. *Banks,* 393 Md. at 709, 904 A.2d at 460; *Hungerford,* 234 Md. at 341, 199 A.2d at 211; *Feldstein,* 198 Md. at 295, 81 A.2d at 615. Therefore, the public's historic use of the beach on Dobbins Island was under a license, now properly subject to revocation by the Clickners. *See Millson v. Laughlin,* 217 Md. 576, 583, 142 A.2d 810, 813 (1958) (noting that if defendant had a mere license to use the property at issue, it was revocable at the pleasure of the grantor); *Oliver v. Hook,* 47 Md. 301, 311 (1877) ("[A] user [that] has been by sufferance and permission only ... [is] but a license, revocable at pleasure, and ... confer[s] no right in the way. It simply relieve[s] the [party] from being a trespasser ...." (citation omitted)); *Goss v. C.A.N. Wildlife Trust, Inc.,* 157 Md.App. 447, 457, 852 A.2d 996, 1002 (2004)

(stating that "a license is merely a personal privilege to do some particular act . . . on [another's] land without possessing any estate or interest therein, while an easement is an interest in land that grants the right to use that land for a specific purpose" (internal quotations omitted)); *State ex rel. Shorett v. Blue Ridge Club*, 22 Wash.2d 487, 156 P.2d 667, 671 (1945) (holding that because public use of a beach was permissive, "[t]he public [was] a licensee and as such could be excluded from the whole area at any time by the title owner").

In conclusion, based on the record before us, we determine that it was error for the trial judge to apply the general presumption of adversity to the public's use of the beach on Dobbins Island, as the beach was unimproved property in a general state of nature. Therefore, the proper presumption to be applied was that public use was by permission of the owners. Because we hold that there was no public prescriptive easement established, as a matter of law, the trial court's judgment and its order mandating the removal of portions of Appellants' fence are reversed.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTION TO ENTER JUDGMENT IN FAVOR OF APPELLANTS, CONSISTENT WITH THIS OPINION. APPELLEES TO PAY THE COSTS.**